FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JANE ROES, 1–2, on behalf of themselves and all others similarly situated, *Plaintiff-Appellee*, | No. 17-17079 <br><br> D.C. No. CV 14-3616 LB |
| v. | |
| SFBSC MANAGEMENT, LLC; CHOWDER HOUSE, INC.; DEJA VU-SAN FRANCISCO, LLC; ROARING 20'S, LLC; GARDEN OF EDEN, LCC; S.A.W. ENTERTAINMENT LIMITED; DEJA VU SHOWGIRLS OF SAN FRANCISCO, LLC; GOLD CLUB-S.F., LLC; BIJOU-CENTURY, LLC; BT CALIFORNIA, LCC, *Defendants-Appellees*, | OPINION |
| v. | |
| SARAH MURPHY; POOHRAWN MEHRABAN; DEVON LOCKE, *Objectors-Appellants*. | |

Appeal from the United States District Court
for the Northern District of California
Laurel D. Beeler, Magistrate Judge, Presiding

Argued and Submitted November 16, 2018
San Francisco, California

Filed December 11, 2019

Before: A. Wallace Tashima and Milan D. Smith, Jr.,
Circuit Judges, and Lawrence L. Piersol,[*] District Judge.

Opinion by Judge Tashima

## SUMMARY[**]

### Labor Law / Class Action Settlement

The panel reversed the district court's approval of a settlement notice process and a class action settlement, negotiated without a certified class, in a case in which exotic dancers working at various nightclubs in San Francisco alleged they were misclassified as independent contractors rather than being treated as employees.

---

[*] The Honorable Lawrence L. Piersol, United States District Judge for the District of South Dakota, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the settlement notice did not meet the "best notice that is practicable under the circumstances" due process standard of Fed. R. Civ. P. 23(c)(2)(B). The content of the notice was adequate, even though it did not include information about related litigation, but the process used was inadequate because notice was sent only once by mail.

The panel held that, in granting approval of the settlement as "fair, reasonable, and adequate" under Rule 23(e), the district court failed to apply the correct legal standard and conduct the heightened inquiry required for review of class action settlements negotiated without a certified class. Accordingly, the district court abused its discretion in approving the settlement. The panel held that, when the parties negotiate a settlement before a class has been certified, the district court must apply a higher level of scrutiny for evidence of collusion or other conflicts of interest before approving the settlement as fair. This more exacting review is warranted to ensure that class representatives and their counsel do not secure a disproportionate benefit at the expense of unnamed plaintiffs. The panel concluded that the district court failed to investigate or adequately address numerous problematic aspects of the settlement and subtle signs of implicit collusion, including a clear sailing agreement, a disproportionate cash distribution to attorneys' fees justified in part by potentially inflated non-monetary relief, large incentive awards to two plaintiffs, and reversionary clauses. The panel reversed and remanded for further proceedings.

**COUNSEL**

Shannon Liss-Riordan (argued), Lichten & Liss-Riordan P.C., Boston, Massachusetts, for Objectors-Appellants.

F. Paul Bland Jr. (argued) and Karla Gilbride, Public Justice P.C., Washington, D.C.; Steven G. Tidrick and Joel B. Young, The Tidrick Law Firm, Oakland, California; for Plaintiffs-Appellees.

Douglas J. Melton (argued) and Shane M. Cahill, Long & Levit LLP, San Francisco, California, for Defendants-Appellees.

Eli Naduris-Weissman, Rothner Segall & Greenstone, Pasadena, California; Charles P. Yezbak III, Yezbak Law Offices PLLC, Nashville, Tennessee; for Amicus Curiae International Entertainment Adult Union.

**OPINION**

TASHIMA, Circuit Judge:

This case arises out of a dispute under federal and California labor law whether exotic dancers working at various nightclubs in San Francisco were misclassified as independent contractors rather than being treated as employees. The district court approved a class action settlement that was negotiated in the absence of a certified class. Objectors-Appellants challenge that settlement approval under Federal Rule of Civil Procedure 23 ("Rule 23"). They contend that the settlement was inadequate because it recovered only a fraction of the class claims' value,

accorded too much weight to worthless "coupons" and injunctive relief, and that the district court disregarded indicia of collusion that warranted additional scrutiny. Objectors-Appellants also challenge the adequacy of the notice process because it involved only a single notice sent by U.S. mail and hanging posters in the defendant nightclubs, and lacked any electronic outreach.

Because the notice did not meet Rule 23's "best notice that is practicable under the circumstances" standard, and because, in granting approval of the settlement, the district court failed to apply the correct legal standard and conduct the heightened inquiry we require for review of class action settlements negotiated without a certified class, we reverse approval of the notice and of the settlement, and remand for further proceedings.

## BACKGROUND

In 2014, Plaintiffs Jane Roes Nos. 1–2 filed this putative class and collective action alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219, and various provisions of the California Labor Code and San Francisco municipal ordinance. The named Plaintiffs, as well as the nearly 4,700 members of the putative Rule 23 class, worked as exotic dancers at eleven adult entertainment clubs in San Francisco. Plaintiffs brought suit against Defendant SFBSC Management, LLC ("SFBSC"), which, "broadly speaking," managed the eleven nightclubs where class members worked.

Plaintiffs alleged that they were misclassified as independent contractors and should have been classified as employees of SFBSC. Plaintiffs sought to recover the

following categories of damages on a classwide basis: unpaid minimum wages under federal, state, and San Francisco law for all hours worked on the clubs' premises; reimbursement of stage fees paid to the clubs for each night that a dancer worked; unpaid overtime wages; liquidated damages; PAGA penalties[1]; and attorneys' fees and costs.

## A.  Litigation History

Shortly after the case was filed, SFBSC brought a motion to compel arbitration.  The district court denied that motion on March 2, 2015, holding that the relevant arbitration provision was unconscionable and therefore unenforceable. SFBSC appealed the district court's decision, but we affirmed, albeit on the alternative ground that SFBSC lacked standing to enforce the arbitration provisions at issue because SFBSC was not a party to the relevant contracts between the nightclubs and class members, which contained the arbitration provision.  *See Roes v. SFBSC Mgmt., LLC*, 656 F. App'x 828, 829 (9th Cir. 2016).

During the appeal concerning the arbitration issue, "the parties conducted three in-person mediations and multiple telephone conferences with the Ninth Circuit Mediator, exchanging information about working conditions, hours worked, compensation, and the parties' relative control over their work, among other matters."  Ultimately, the parties executed a settlement agreement and, per the parties' stipulation, we then dismissed the appeal without prejudice to

---

[1] PAGA refers to the California Private Attorneys General Act, Cal. Labor Code §§ 2698–2699.5, which authorizes aggrieved employees to file lawsuits to recover civil penalties on behalf of themselves, other employees, and the State of California for Labor Code violations.

its reinstatement if the district court did not approve the parties' settlement.   As part of the settlement, and for settlement purposes only, the parties agreed to add the eleven individual nightclubs as defendants; they submitted a proposed second amended complaint to that effect.

Meanwhile, during the appeal and negotiation process, counsel who now represents Objectors Sarah Murphy, Poohrawn Mehraban, and Devon Locke (collectively, "Objectors") brought two separate misclassification suits directly against three of those nightclubs—Larry Flynt's Hustler Club, the Gold Club, and Condor Gentlemen's Club. The suits, *Hughes v. S.A.W. Entm't, Ltd.*, 16-cv-03371-LB (N.D. Cal.), and *Pera v. S.A.W. Entm't, Ltd.*, 17-cv-00138-LB (N.D. Cal.), involve the same kind of substantive claims for wage-and-hour violations as are involved here.  When the plaintiffs in those cases discovered that they were part of the putative class in this case, and learned the proposed terms of the settlement in this case, they objected to preliminary approval of the settlement.

## B.  The Settlement and its Approval

Following dismissal of the appeal, the Roe parties moved for preliminary approval of their proposed class action settlement pursuant to Rule 23(e). The Settlement Agreement proposed to release wage claims against SFBSC, as well as against the individuals and entities—which had not been named in the original complaint—that directly owned and operated the eleven nightclubs in San Francisco.  In return, the settlement included several different types of consideration.

First, the proposed settlement provided for two tiers of cash: a first tier of $2 million ("First Tier Cash Pool") and a possible second tier of up to $1 million ("Second Tier Cash Pool"). The First Tier Cash Pool would be used for: (1) cash compensation to Settlement Class Members who timely elected to receive a Cash Payment, (2) attorneys' fees and expenses, (3) enhancement payments of up to $71,000 total, (4) a $100,000 PAGA payment,[2] and (5) administrative costs of up to $50,000. Only if the sum of those five items exceeded $2 million, would the defendants be required to fund the Second Tier Cash Pool in the amount, up to $1 million, sufficient to fully cover the sum of the valid claims for cash payment, the attorneys' fees and expenses, the enhancement payments, the PAGA payment, and administrative costs. Under the proposed settlement, the Cash Payments were calculated based on the number of months in which a class member had worked for the nightclubs during the class period, and ranged from $350 to $800, although the amount could be increased or reduced on a pro rata basis based on the number of claims submitted. To receive a Cash Payment, class members had to submit an FLSA claim form by the deadline.

Second, the proposed settlement also provided for up to $1 million in "dance fee payments." A "dance fee" is the published amount that a customer at the defendant nightclubs

---

[2] Seventy-five percent of the PAGA payment must be distributed to the California Labor and Workforce Development Agency for enforcement of labor laws and for education of employers and employees about their rights and responsibilities. *See* Cal. Lab. Code § 2699(i).

must pay to a dancer for each dance that she performs.[3] The clubs normally retain a significant portion of those fees pursuant to their "Dancer Contracts." As part of the settlement, a class member who continues to work at one of the defendants' clubs could claim as much as $8,000 in "dance fee payments" in lieu of a cash settlement share. Such "dance fee payments" would allow a class member to, on specified nights, keep the "dance fees" that she would normally remit to the clubs. Specifically, a dancer could receive up to $5,000 in "dance fee payments" to be used at a "Primary Nightclub" she designates on her claim form, and up to $3,000 to be used at her "Secondary Nightclub."[4]. The settlement required a class member to schedule, at least three business days in advance, a Date of Performance at her Primary or Secondary Nightclub during the two-year Dance Fee Redemption Period. On that Date of Performance, she would then be permitted to retain 100% of the dance fees she earned, capped at her total dance fee payment allocation for that nightclub.

If the total amount of Dance Fee Payments claimed was less than $100,000 for any of the defendant nightclubs, that nightclub would create a "Residual Dance Fee Payment Pool" for the residual amounts. Class members who did not submit an FLSA claim form during the original claims period could

---

[3] We recognize that not all exotic dancers are female and our use of feminine pronouns should not be interpreted to imply as much. It appears that most, if not all, class members are female, but our discussion applies equally to all class members, regardless of gender.

[4] However, if the total dance fee payment claims exceeded $100,000 for any single nightclub, all of the claims for that nightclub would be reduced on a pro rata basis such that the total in dance fee payment claims for that nightclub did not exceed $100,000.

claim dance fee payments from the Residual Pool by submitting a Residual Dance Fee Claim Form, which would be available from management at the clubs and would contain an acknowledgment that the claimant did not submit an FLSA claim. The dance fee payment vouchers were set to expire in two years, at which time the "value" of any unredeemed claims (i.e., of dance fee payments that class members had claimed, but had not yet cashed in by working on a scheduled Date of Performance) would revert to the defendant nightclubs.

Third, the settlement also included an injunction memorializing the clubs' offer of employee status to prospective dancers, under which any dancer interested in working at the clubs would be given the "option" of working as an employee or independent contractor. The employee option would provide dancers with an hourly rate of $15, plus a 20% commission for total sales of private dances over $150 on any given night. Other changes made to the nightclubs' business practices under the settlement involved reviewing employment choices (independent contractor versus employee status) with dancers, the context in which those choices are permitted to be made (not while intoxicated or nude), provisions allowing dancers to change their status to an employee, control over clothing choices for independent contractors, a prohibition against tip-sharing for independent contractors, training videos, and guaranteed average earnings for independent contractors.

The settlement would release all state law wage claims of approximately 4,700 members of the class spanning nearly seven years, from August 8, 2010, to April 14, 2017 (the date of preliminary approval). If a class member did not exclude herself from the settlement, she released all wage claims

except claims under the FLSA. If a class member submitted a claim form, she released all claims, including her FLSA claims.

Despite objections, the district court preliminarily approved the settlement and the class notice plan on April 14, 2017. The claims administrator subsequently mailed, by U.S. mail, the court-approved notice to class members at their last known address from their most recent contract with defendants, or at any more current address reflected in the National Change of Address database. When 1,546 notices of the 4,681 notices mailed were returned as undeliverable, the administrator performed address traces and resent notices, but ultimately a total of 560 notices remained undeliverable. No reminder, follow up, or electronic notice was sent to any class member. However, Plaintiffs did set up a settlement website, and "the nightclubs displayed posters in the dancers' dressing rooms to ensure that they were seen, were confident that they were seen by all entertainers at the clubs, and responded to questions by encouraging entertainers to review the settlement notice, website, and poster."

Following the distribution of notice and the close of the period during which class members could opt out, object, or file a claim, the parties moved for final settlement approval. They reported that only 865 out of 4,681 class members (18.5% of the class) submitted claim forms to receive payments from the settlement; of those, 790 opted for a cash payment and 75 opted for a Dance Fee Payment. Fourteen class members requested exclusion from the settlement, and several class members filed objections, challenging both the fairness of the settlement and the adequacy of the notice.

As a result of the low claims rate, defendants were not required to fund the Second Tier Cash Pool of $1 million (i.e., that money reverted to defendants). In addition, although the parties initially expected that the class members would receive approximately $350–$800 each if they submitted claims for cash payments, the individual shares ultimately ranged from $650–$1500 as a result of the low claims rate.[5] At the time of final approval, 75 class members had claimed a face value of $370,000 of the Dance Fee Payment Pool. Class members could continue to claim these dance fee payment vouchers for two years after final approval; however, the vouchers would be distributed on a first come, first served basis.

Despite vigorous objections, the district court granted final approval, deemed the notice adequate, and awarded the requested attorneys' fees and service awards. Overall, the settlement provided $2 million in cash, of which $950,000—more than the class would receive in total cash distribution—was allocated to attorneys' fees. Specifically, beside the $950,000 in attorneys' fees, $864,115 went to payments to class members, $4,884.21 to expenses, $71,000

---

[5] In particular, the cash distribution shares were allotted as follows:

- $1,500.77 for Cash Payment Claimants who accrued 24 or more Performance Months during the Class Period;

- $1,313.17 for Cash Payment Claimants who accrued between 12 and 23 Performance Months during the Class Period;

- $937.98 for Cash Payment Claimants who accrued between 6 and 11 Performance Months during the Class Period; and

- $650.59 for Cash Payment Claimants who accrued fewer than 6 Performance Months during the Class Period.

to incentive payments,[6] $35,000 to the costs of settlement administration, and $75,000 to the State of California (for the PAGA allocation). Objectors appealed, challenging both the adequacy of the notice to class members and the district court's approval of the settlement.

## STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291, and "[w]e review a district court's rulings regarding notice de novo." *Molski v. Gleich*, 318 F.3d 937, 951 (9th Cir. 2003) (citing *Silber v. Mabon*, 18 F.3d 1449, 1453 (9th Cir. 1994)), *overruled on other grounds by Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571 (9th Cir. 2010), *rev'd*, 564 U.S. 338 (2011); *see also Lane v. Facebook, Inc.*, 696 F.3d 811, 834 (9th Cir. 2012) (Kleinfeld, J., dissenting) (explaining that we review adequacy of notice de novo, rather than deferentially, "because notice is a matter of due process of law," and "[i]f a person owns a claim, it is property, and the owner of the claim is constitutionally entitled not to have it taken from him except with reasonable notice and an opportunity to be heard").

We "review a district court's decision to approve a class action settlement 'for clear abuse of discretion.'" *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 942 (9th Cir. 2015) (quoting *In re Bluetooth Headset Prods. Liab.*

---

[6] The district court approved the requested incentive service awards of $5000 each to Jane Roes 1 and 2, and $3500 each to Jane Roe 3, Jane Roes 10 through 13, and Jane Roe 22, for a total of $31,000. In addition, the court approved requested enhancement payments of $20,000 each to Jane Roes 1 and 2 for their execution of general release forms, bringing the total of all incentive payments to $71,000.

*Litig.*, 654 F.3d 935, 940 (9th Cir. 2011)). "A court abuses its discretion when it fails to apply the correct legal standard or bases its decision on unreasonable findings of fact." *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038 (9th Cir. 2011). Although our own substantive review of class settlement fairness is "extremely limited," we hold district courts to a "higher procedural standard when making that determination of substantive fairness." *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015). "That procedural burden is more strict when a settlement is negotiated absent class certification." *Id.* at 1224. In such cases, the district court abuses its discretion if it fails to apply "an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e)." *In re Bluetooth*, 654 F.3d at 946. We review a pre-certification settlement approval not only for whether the district court has "explored comprehensively all factors, . . . given a reasoned response to all non-frivolous objections," and "adequately . . . develop[ed] the record to support its final approval decision," but also for whether the district court has looked for and scrutinized any "subtle signs that class counsel have allowed pursuit of their own self-interests . . . to infect the negotiations." *Allen*, 787 F.3d at 1223–24 (third alteration in original) (first quoting *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012); then quoting *In re Bluetooth*, 654 F.3d at 947).

## DISCUSSION

The main thrust of Objectors' argument on appeal is that the district court abused its discretion in approving a class action settlement that does not provide enough benefit to class members and contains indicia of collusion. As part of this challenge to settlement approval, Objectors also argue

that the notice process that was used to inform class members about the proposed settlement was inadequate.  Because the adequacy of notice can not only play a role in the overall fairness of the settlement, but is also a discrete issue subject to a de novo standard of review, we address Objectors' challenge to the adequacy of notice first and then turn to the district court's approval of the settlement as a whole.

## I.  Adequacy of Class-Wide Settlement Notice

On appeal, Objectors argue that the settlement notice provided in this case was inadequate for two reasons: (1) content-wise, the notice was inadequate because it did not notify class members about the related *Hughes* and *Pera* lawsuits; and (2) the process used to provide notice was inadequate because notice was sent only once by mail—no reminder notice or electronic notice was given.  As explained below, we reject Objectors' first argument because the notice met the requirements to provide various information about the settlement in *this* case, but we agree with Objectors' second argument that the notice process was insufficient in that it did not provide the "best notice practicable."

### A. Notice Contents: Information About Related Litigation

Objectors argue that the district court erred under Rule 23 by approving the proposed class settlement notice as written and refusing to require that the notice include information about the related *Hughes* and *Pera* lawsuits.  Objectors contend that the notice should have, at minimum, informed class members of the existence of the other lawsuits and provided contact information for plaintiffs' counsel in those cases.  According to Objectors, by failing to notify class

members "that another group of plaintiffs had filed cases directly against the clubs that could provide [class members] an avenue to continue to pursue their wage claims, should they not be satisfied with the result of this settlement," the notice did not provide sufficient information to allow class members to "make an intelligent, informed decision about what to do."

However, as the district court explained in its preliminary approval order, none of the cases cited by Objectors in support of this argument compels the inclusion in a settlement notice of such information about parallel litigation. In fact, although Rule 23 lists seven items that must be included in the required notice, information about related lawsuits is not one of them. *See* Fed. R. Civ. P. 23(c)(2)(B) (requiring that the notice "clearly and concisely" state "the nature of the action," the "definition of the class certified," the "class claims, issues, or defenses," information about appearing and opting out, and "the binding effect of a class judgment on members"). As we have consistently maintained, Rule 23(e) simply "requires notice that describes 'the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'" *In re Online DVD-Rental*, 779 F.3d at 946 (quoting *Lane*, 696 F.3d at 826); *see also Lane*, 696 F.3d at 826 (holding that Rule 23(e) "does not require detailed analysis of the statutes or causes of action forming the basis for the plaintiff class' claims, and it does not require an estimate of the potential value of those claims").

Our Circuit has previously explained, in a case in which objectors similarly challenged the adequacy of the settlement notice, the rationale for not requiring additional information beyond that specified in Rule 23:

Objectors contend that the Settlement Notice also failed to provide a meaningful description of the terms of the settlement, including the content of objections and the expected value of fully litigating the case. In our view, the Notice contains adequate information, presented in a neutral manner, to apprise class members of the essential terms and conditions of the settlement. The Notice advises class members that a majority (hence, not all) of the class representatives approve the settlement. It describes the aggregate amount of the settlement fund and the plan for allocation, thereby complying with what we require. While the Notice does not detail the content of objections, or analyze the expected value, we do not see why it should. Settlement notices are supposed to present information about a proposed settlement neutrally, simply, and understandably—objectives not likely served by including the adversarial positions of objectors. We therefore conclude that the Notice communicated the essentials of the proposed settlement in a sufficiently balanced, accurate, and informative way to satisfy due process concerns.

*Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 962–63 (9th Cir. 2009) (footnote omitted) (citations omitted).

Under *Rodriguez*, the district court did not err in rejecting Objectors' proposed additional information about the *Hughes* and *Pera* lawsuits. While it may be true that such

information could have allowed class members to make a more "informed" decision about their options, declining to include the information did not contravene the due process requirement to provide sufficient information about the settlement in this case. *See In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 567 (9th Cir. 2019) (en banc) ("Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'" (quoting *Rodriguez*, 563 F.3d at 962).

## B. Notice Process:    Sufficiency of Single Mailed Notice

Next, we turn to the sufficiency of the procedures that the parties used to effect notice. In cases like this one, in which a class is certified under Rule 23(b)(3) for purposes of settlement, the Federal Rules require that the district court "direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Because Rule 23's notice requirement is designed to ensure that class notice procedures comply with the demands of due process, the Supreme Court's due process case law further illuminates the Rule 23 standard. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974); Fed. R. Civ. P. 23 advisory committee's note to 1966 amendment ("This mandatory notice pursuant to subdivision (c)(2) . . . is designed to fulfill requirements of due process to which the class action procedure is of course subject."). To meet the constitutional guarantee of procedural due process, "notice must be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to

present their objections.'" *Eisen*, 417 U.S. at 174 (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). That is, "[t]he means employed [to provide notice] must be such as [a person] desirous of actually informing the absentee might reasonably adopt to accomplish it." *Mullane*, 339 U.S. at 315.

Objectors argue that the notice process used in this case did not meet Rule 23's mandate for "the best notice practicable," in part because "the parties did not provide for any e-mail distribution of the settlement notice" or for "any reminder notice, both of which are now routine in class action administration." Instead, even though the parties appeared to believe that it might be difficult to reach the class members because of their "transient" nature, the claims administrator sent class members the court-approved notice by mail. When 1,546 notices of the 4,681 notices mailed were returned as undeliverable, the administrator performed address traces and resent notices, but ultimately a total of 560 notices remained undeliverable. Nor did the administrator send any follow-up notice even to those class members to whom mailed notice was deliverable. Objectors characterize this notice procedure as "halfhearted," and fault it for the "low claims rate" of 18.5%. *Amicus Curiae* International Entertainment Adult Union ("Union") similarly asserts that the notice process used in this case "does not appear to be the best notice practicable in this digital age." The district court nevertheless concluded that the notice "met all legal requisites," in part because, in addition to the mailing, defendants set up a settlement website, and the nightclubs displayed posters in the dancers' dressing rooms.

Reviewing the notice process de novo, *see Molski*, 318 F.3d at 951, we agree with Objectors that it fell short of

"the best notice that is practicable under the circumstances."
Fed. R. Civ. P. 23(c)(2)(B).    We find it particularly
problematic that, despite concerns that former employees in
particular might be difficult to reach by mail, the settlement
provided no other means of reaching former employees.  And
when at least 12% of the mailed notices were ultimately
determined to be undeliverable—meaning those class
members had not received notice—still no additional means
of notice reasonably calculated to reach those class members
was attempted.[7]  *See Eisen*, 417 U.S. at 173; *see also In re
Hyundai & Kia*, 926 F.3d at 567 ("[I]t is 'critical' that class
members receive adequate notice." (quoting *Hanlon v.
Chrysler Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998)
*overruled on other grounds by Wal-Mart Stores, Inc.*,
564 U.S. 338)).    Although the mailed notice was
supplemented with posters that were hung in the defendant
night clubs, those posters were likely to be seen only by class
members who were still working at the nightclubs, and those
class members are also the precise group of people for whom
the defendants likely had a current address such that mail
notice could successfully be effected.  That is to say, the
*former* employees for whom the defendants did *not* have a

---

[7] Although we have held that neither due process nor Rule 23's
standard necessarily require actual notice, *Silber*, 18 F.3d at 1454, the
response rate of only 18.5%—which seems low for a scenario in which
class members stood to receive hundreds of dollars if they made a
claim—provides further indication that class members may not have
received adequate notice of the settlement. The district court justified this
claims rate by asserting that the "exotic dancers are transient workers; that
affects the hit rate for claimants."  Regardless of whether this assertion of
transience is correct—the Union argues that it is unsupported by any
evidence and is instead based on stereotypes—if the district court believed
that class members might be more difficult to reach because they were
"transient," it should have taken that factor into consideration when
determining what notice process would be adequate.

current address, and thus were the class members who may not have received a mailed notice, also would not have seen the posters.[8]  As to those former employees for whom the claims administrator *was* able to identify a valid address, the lack of reminder notices is particularly relevant, given that the posters would serve no function.  In sum, the notice process was not "reasonably calculated, under all the circumstances," to apprise all class members of the proposed settlement, because the "circumstances" included the district court's and parties' belief that class members were "transient" and thus might be difficult to reach by mail, and the posters also were not reasonably calculated to reach all of the absent class members who could not be notified by mail or to serve as a reminder to those who did receive the single mailed notice.  *Mullane*, 339 U.S. at 315.

Moreover, because there were numerous other reasonable options that could have been pursued to improve the notice process, it is not the case that, despite the shortcomings discussed above, the notice used was "the best notice that [was] *practicable under the circumstances*."  Fed. R. Civ. P. 23(c)(2)(B) (emphasis added).  For example, even if, as defendants suggest, e-mail notice was infeasible,[9] information about the settlement could have been electronically disseminated through social media or postings on any

---

[8] The district court does not appear to have considered this issue, nor, as far as we can tell, did it inquire as to how many class members still worked at the nightclubs, which would have been relevant to understanding the extent of the posters' efficacy in providing notice to absent class members.

[9] Defendants point out that they did not have e-mail addresses for the class members, so sending email notice would in no way have been "practicable under the circumstances."  Fed. R. Civ. P. 23(c)(2)(B).

relevant online message boards. To illustrate this possibility, the Union points out that, in another settlement involving sister entities of some of the defendants in this case, the parties disseminated notice not only via U.S. Mail and email, but also through ads targeting class members on social media, and by posting on StripperWeb.com, a website that has 117,000 members and has forums dedicated to the exotic dancer community. Particularly here, where the parties knew the names and other identifying information of the class members—even if not all of their current addresses—these types of supplemental notice methods appear practicable. Publication notice has long been used as a supplement to other forms of notice, and technological developments are making it ever easier to target communications to specific persons or groups and to contact individuals electronically at little cost.[10]

That is not to say that due process would require the parties to implement all of these potential options for improving the notice process. But the parties must provide notice "reasonably calculated" to apprise all class members of the settlement, which here required the parties to at least make some reasonable attempt to reach former employees who could not be notified by mail. *Mullane*, 339 U.S. at 315 ("[W]hen notice is a person's due, process which is a mere gesture is not due process."). This is particularly important where, as here, the proposed settlement has reversionary

---

[10] For example, Facebook makes it possible to target ads to a custom audience of people based on identifying information such as first name, last name, phone number, city, state, date of birth, year of birth, age, zip code, and gender. *See About Targeting New Audiences*, FACEBOOK BUSINESS, https://www.facebook.com/business/help/717368264947302 (last visited Aug. 1, 2019).

aspects, and those who did not receive notice and make a claim by the deadline can only possibly obtain dance fee payments—which are likely worthless to former employees.

For the foregoing reasons, something more was required here to meet the standard of the "best notice practicable" and to ensure that the valuable claims of absent class members were not wiped out without affording them an opportunity to opt out, object, or claim a cash payment. *See* Fed. R. Civ. P. 23(c)(2)(B). Because the notice plan utilized in this case did not adequately heed the constitutional due process guarantees embodied by Rule 23's notice requirements, we reverse the district court's approval of the notice process.

## II. District Court's Approval of Settlement Under Rule 23

Next, Objectors argue that the district court also erred in approving the class settlement as "fair, reasonable, and adequate" under Rule 23(e). They contend that the district court was required to, but did not, apply heightened scrutiny of the settlement after being faced with several indicia of collusion, and that the district court abused its discretion by accepting as sufficient "a class settlement that would release valuable wage claims of 4,700 exotic dancers at eleven nightclubs, spanning a nearly seven-year class period, for only $2 million in cash,"—which, according to Objectors, is only 1.7% to at most 4.3% of the value of the primary claims—"nearly half of which would be paid for attorney's fees." As explained below, because the district court applied an incorrect legal standard and failed to employ the heightened scrutiny required to meet the strict procedural burden we impose for assessing class settlements negotiated prior to class certification, we hold that the district court

abused its discretion in approving the settlement. *See Nachshin*, 663 F.3d at 1038 ("A court abuses its discretion when it fails to apply the correct legal standard . . . .").

Because of the unique due process concerns relating to absent class members and the inherent risk of collusion between class counsel and defense counsel, Federal Rule of Civil Procedure 23(e) requires district courts to review proposed class action settlements for fairness, reasonableness, and adequacy. Prior to Congress' 2018 codification of a new multifactor test for this review,[11] we held that a district court "may consider some or all of the following factors" when assessing whether a proposed settlement meets this standard:

> [1] the strength of plaintiffs' case; [2] the risk, expense, complexity, and likely duration of further litigation; [3] the risk of maintaining class action status throughout the trial; [4] the amount offered in settlement; [5] the extent of discovery completed, and the stage of the proceedings; [6] the experience and views of counsel; [7] the presence of a governmental participant; and [8] the reaction of the class members to the proposed settlement.

*Rodriguez*, 563 F.3d at 963 (citations omitted).

---

[11] Subsequent to the district court's approval of the proposed class settlement in this case, Congress codified its own multifactor test comprising "the primary procedural considerations and substantive qualities that should always matter to the decision whether to approve the proposal." Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment. Because it does not affect our analysis here, we decline to address whether the new Rule 23(e)(2) test should be applied retroactively.

Where, however, the parties negotiate a settlement agreement before the class has been certified, "settlement approval 'requires a higher standard of fairness' and 'a more probing inquiry than may normally be required under Rule 23(e).'" *Dennis*, 697 F.3d at 864 (quoting *Hanlon*, 150 F.3d at 1026). Specifically, "such [settlement] agreements must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair." *In re Bluetooth*, 654 F.3d at 946. This more "exacting review" is warranted "to ensure that class representatives and their counsel do not secure a disproportionate benefit 'at the expense of the unnamed plaintiffs who class counsel had a duty to represent.'" *Lane*, 696 F.3d at 819 (quoting *Hanlon*, 150 F.3d at 1027). The "subtle signs" of collusion for which we require district courts to look include, for example:

> (1) "when counsel receive a disproportionate distribution of the settlement;" (2) "when the parties negotiate a 'clear sailing' arrangement" (i.e., an arrangement where defendant will not object to a certain fee request by class counsel); and (3) when the parties create a reverter that returns unclaimed [funds] to the defendant.

*Allen*, 787 F.3d at 1224 (quoting *In re Bluetooth*, 654 F.3d at 947).

In determining whether to approve the settlement here, the district court appropriately referred to the Rule 23 "fair, reasonable, and adequate" standard and the factors that our Circuit has identified as relevant to assessing whether a class

settlement meets that standard. Nowhere in the final approval order, however, did the district court cite or otherwise acknowledge our longstanding precedent requiring a heightened fairness inquiry prior to class certification. To the contrary, the district court declared that, "[w]here a settlement is the product of arms-length negotiations conducted by capable and experienced counsel, the court begins its analysis with a *presumption that the settlement is fair and reasonable*." (Emphasis added.) But such a presumption of fairness is not supported by our precedent, and the district court cites no Ninth Circuit case which adopted this standard.[12] Particularly in light of the fact that we not only have never endorsed applying a broad presumption of fairness, but have actually required that courts do the opposite—by employing extra caution and more rigorous scrutiny—when it comes to settlements negotiated prior to class certification, the district court's declaration that a presumption of fairness applied was erroneous, a misstatement of the applicable legal standard which governs analysis of the fairness of the settlement.

Not only did the district court misstate the legal standard, but the record makes clear that, in fact, the district court

---

[12] A presumption of fairness was commonly applied by district courts in our circuit prior to Congress' 2018 codification of standards for evaluating whether a proposed class settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); 4 William B. Rubenstein, *Newberg on Class Actions* § 13:50 n.9 (5th ed. 2019) (collecting Ninth Circuit district court cases). Even assuming this was proper then, it is very likely inappropriate under the standards now codified in Rule 23(e)(2). Rule 23(e)(2) now identifies "whether . . . the proposal was negotiated at arm's length" as one of four factors that courts must consider and does not suggest that an affirmative answer to that one question creates a favorable presumption on review of the other three. Fed. R. Civ. P. 23(e)(2)(B).

failed to apply the correct legal standard and to conduct the searching inquiry required, thereby abusing its discretion. *See Nachshin*, 663 F.3d at 1038. In particular, as discussed further below, there were numerous problematic aspects of the settlement and subtle signs of implicit collusion that the district court was obligated to—but did not—investigate or adequately address, including a clear sailing agreement, the disproportionate cash distribution to attorneys' fees, large incentive payments seemingly untethered from service to the class, and reversionary clauses that would return unclaimed funds to the defendants.[13] The district court's failure to fulfill

---

[13] The court's conclusory statement, without any further analysis, that "the settlement is the product of serious, non-collusive, arm's length negotiations and was reached after mediation with an experienced mediator at the Ninth Circuit" is insufficient. As we have many times explained, "[t]he incentives for the negotiators to pursue their own self-interest and that of certain class members are implicit in the circumstances and can influence the result of the negotiations without any explicit expression or secret cabals." *Staton v. Boeing Co.*, 327 F.3d 938, 960 (9th Cir. 2003). Thus, "the mere presence of a neutral mediator . . . is not on its own dispositive of whether the end product is a fair, adequate, and reasonable settlement agreement." *In re Bluetooth*, 654 F.3d at 948. Instead, the "real dangers in the negotiation of class action settlements of compromising the interests of class members for reasons other than a realistic assessment of usual settlement considerations" are "why district court review of class action settlements includes not only consideration of whether there was *actual* fraud, overreaching or collusion but, as well, substantive consideration of whether the terms of the decree are 'fair, reasonable and adequate to all concerned.'" *Staton*, 327 F.3d at 959–60 (quoting *Officers for Justice v. Civil Serv. Comm'n of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982)); *see also In re Bluetooth*, 654 F.3d at 948 ("While the Rule 23(a) adequacy of representation inquiry is designed to foreclose class certification in the face of '*actual* fraud, overreaching or collusion,' the Rule 23(e) reasonableness inquiry is designed precisely to capture instances of unfairness not apparent on the face of the negotiations." (quoting *Staton*, 327 F.3d at 960)).

its obligation to scrutinize these areas of concern requires that we vacate the settlement approval and remand for further proceedings. *See Allen*, 787 F.3d at 1224 (vacating final settlement approval and remanding for "a more searching inquiry" where the district court failed to scrutinize three subtle warning signs—a reversionary clause, a clear sailing agreement, and a disproportionately large attorneys' fees award—that appeared in the settlement).

Although we leave the final fairness determination to the district court after an opportunity to apply the appropriate heightened review and further develop the record, we identify several aspects of the settlement that in our view cast serious doubt on whether the settlement meets the applicable fairness standard. *See Allen*, 787 F.3d at 1223 (noting that we may "overturn an approval of a compromised settlement" on substantive grounds if "the terms of the agreement contain convincing indications that . . . self-interest rather than the class's interests in fact influenced the outcome of the negotiations" (alteration in original) (quoting *Staton*, 327 F.3d at 960)). To explain our concerns and to illustrate the type of scrutiny to which the district court should have subjected these aspects of the settlement, we discuss each of them in turn.

---

Moreover, because the proceedings before the Ninth Circuit Mediator are not part of the record, nor do we have a statement from the Mediator setting forth the extent to which the Mediator took into account and considered the *Hanlon* and *Bluetooth* factors, as well as the issues raised by *Rodriguez*, even assuming that it would be proper to rely on a mediator's assessment of the Rule 23 factors in brokering a pre-class-certification settlement, the record here does not permit us to do so.

## A.  Clear Sailing Agreement and Attorneys' Fees

First, the settlement agreement included a clear sailing agreement, whereby the defendants agreed that they would not object to an attorneys' fees-and-expense award of up to $1 million.  "Although clear sailing provisions are not prohibited, they 'by [their] nature deprive[] the court of the advantages of the adversary process' in resolving fee determinations and are therefore disfavored." *In re Bluetooth*, 654 F.3d at 949 (alterations in original) (quoting *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 525 (1st Cir. 1991)).  More importantly, we have repeatedly explained that "'clear sailing' agreements on attorneys' fees are important warning signs of collusion," *Lane*, 696 F.3d at 832, because "[t]he very existence of a clear sailing provision increases the likelihood that class counsel will have bargained away something of value to the class,"[14] *In re*

---

[14] As we have repeatedly explained, one of the "unique due process concerns for absent class members" is an "inherent risk . . . that class counsel may collude with the defendants, 'tacitly reducing the overall settlement in return for a higher attorney's fee.'"  *In re Bluetooth*, 654 F.3d at 946 (first quoting *Hanlon*, 150 F.3d at 1026; then quoting *Knisley v. Network Assoc.*, 312 F.3d 1123, 1125 (9th Cir. 2002)); *see also Evans v. Jeff D.*, 475 U.S. 717, 733 (1986) (recognizing that "the possibility of a tradeoff between merits relief and attorneys' fees" is often implicit in class action settlement negotiations); *In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1178 (9th Cir. 2013) ("[B]ecause the interests of class members and class counsel nearly always diverge, courts must remain alert to the possibility that some class counsel may 'urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees.'" (quoting *Weinberger*, 925 F.2d at 524)); *Staton*, 327 F.3d at 964 ("If fees are unreasonably high, the likelihood is that the defendant obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members or less injunctive relief for the class than could otherwise have obtained.").

*Bluetooth*, 654 F.3d at 948 (quoting *Weinberger*, 925 F.2d at 525).

As a result, "when confronted with a clear sailing provision, the district court has a heightened duty to . . . scrutinize closely the relationship between attorneys' fees and benefit to the class, being careful to avoid awarding 'unreasonably high' fees simply because they are uncontested." *Id.* (quoting *Staton*, 327 F.3d at 954). Here, however, the district court did not scrutinize the clear sailing provision. And although the district court did examine the basis for the fee request and perform a lodestar cross-check, it did not—as was particularly important given the clear sailing provision—substantively grapple with some of the potentially problematic aspects of the "relationship between attorneys' fees and the benefit to the class." *See id.*

Here, more of the available $2 million in settlement cash ultimately went to attorneys' fees ($950,000) than would be distributed to class members ($864,115). While this is not per se problematic, such a disproportionate cash allocation makes it all the more important for the district court closely to examine the claimed value of the non-cash portions of the settlement that were used to justify the requested attorneys' fees. *See Staton*, 327 F.3d at 953 ("[C]oncerns about the fairness of settlement agreements 'warrant special attention when the record suggests that settlement is driven by fees; that is, when counsel receive a disproportionate distribution of the settlement.'" (quoting *Hanlon*, 150 F.3d at 1021)).

In this case, the district court accepted the parties' valuation of $1 million for the injunctive relief component of the settlement and $1 million for the Dance Fee Payment Pool. Adding the $2 million First Tier Cash Pool, the district

court used a total settlement value of $4 million for the lodestar cross-check, and concluded that the $950,000 in attorneys' fees was reasonable because it was only 23.75% of the total settlement value. Objectors, however, raised concerns regarding the district court's valuation of both the dance fee payments and the injunctive relief, and renew those challenges once more on appeal.

First, Objectors argue that the dance fee payments are coupons and that the Dance Fee Payment Pool from which those coupons are drawn cannot be accorded its full face value of $1 million because: (1) the coupons expire in two years; (2) any unredeemed coupons or unclaimed portion of the Dance Fee Payment Pool will revert to defendants after that two year period; (3) many class members likely no longer work at the defendant nightclubs, but redeeming the dance fee payments requires just that, so it is unlikely that the full value of the Dance Fee Payment Pool will be claimed and redeemed; (4) the dance fee payment coupons fail to disgorge ill-gotten gains from the defendants, because in order to "cash in" and redeem dance fee payment coupons, a class member must first pay a stage fee in order to be able to perform at the club, and her work will also generate additional revenue for defendants through sales of food and beverages; and (5) the terms of the settlement show that the parties themselves considered the coupons to be worth approximately 10% of their face value, because a dancer who worked more than two years during the class period could claim either $800 in cash or $8,000 in dance fee payment coupons.[15]

---

[15] Objectors further point out that, if the dance fee payment coupons are valued at face value, then the settlement unfairly favors current dancers (who could claim up to $8,000 in dance fee payments) over former dancers (who could only claim a significantly smaller cash

The district court dismissed the Objectors' "quarrel with the dance fee payments" by noting that the payments provide "a tangible benefit," and by claiming that a dance fee payment "is not the ordinary illusory coupon payment with a more arguable lack of value." However, the district court did not substantively investigate or address all of the concerns raised by Objectors, nor did it explain why the Dance Fee Payment Pool should nevertheless be valued at its $1 million maximum.[16] Regardless of whether the dance fee payment vouchers are officially "coupons" within the meaning of the Class Action Fairness Act ("CAFA"), the district court should have recognized that some of the same concerns applicable to coupon settlements also apply here and warranted closer scrutiny of the Dance Fee Payments Pool.[17]

_____

payment), which would present its own problems for fairness.

[16] We offer the analysis that follows under the assumption that the dance fee payments were at least legal, notwithstanding the fact that class members seeking to redeem the dance fee payments would need to continue working as independent contractors. We express no opinion on the underlying merits of that issue, whether before or after the California Supreme Court's decision in *Dynamex Operations West Inc. v. Superior Court*, 416 P.3d 1 (Cal. 2018).

[17] The Class Action Fairness Act sets forth several requirements and protections applicable specifically to "coupon settlements," *see* 28 U.S.C. § 1712, with the goal of "preventing settlements that award excessive [attorneys'] fees while leaving class members with 'nothing more than promotional coupons to purchase more products from the defendants.'" *In re Easysaver Rewards Litig.*, 906 F.3d 747, 755 (9th Cir. 2018) (quoting *In re Online DVD-Rental*, 779 F.3d at 950). Because the statute "provides no definition of 'coupon,' . . . courts have been left to define that term on their own, informed by § 1712's animating purpose." *Id.* We have "outlined three factors to guide this inquiry: (1) whether class members have 'to hand over more of their own money before they can take advantage of' a credit, (2) whether the credit is valid only 'for select

In particular, as with coupon settlements, it was possible here that the parties overstated the value of the Dance Fee Payment Pool, thereby inflating attorneys' fees and as a result reducing the amount of cash available to class members who were not interested in the dance fee payment vouchers. *See In re Easysaver*, 906 F.3d at 755 ("Congress targeted [coupon] settlements for heightened scrutiny out of a concern that the full value of coupons was being used to support large awards of attorney's fees regardless of whether class members had any interest in using the coupons."). As we have explained:

> Typically, courts try to ensure faithful representation by tying together the interests of class members and class counsel. That is, courts aim to tether the value of an attorneys' fees award to the value of the class recovery. Where both the class and its attorneys are paid in cash, this task is fairly effortless. The district court can assess the relative value of the attorneys' fees and the class relief simply

---

products or services,' and (3) how much flexibility the credit provides, including whether it expires or is freely transferrable." *Id.* (quoting *In re Online DVD-Rental*, 779 F.3d at 951).

Here, the dance fee payments vouchers are not the regular type of "coupons" that are awarded to consumer classes for use toward a purchase of a product or service from defendant corporations. However, the dance fee payments do resemble what one might imagine the equivalent of a coupon to be in the context of an employer-employee relationship, in that the settling employer is providing the employee with effectively a piece of paper that can be redeemed for value by taking additional steps that involve the defendant. As a result, some of the same types of concerns relevant to "coupon" settlements also apply to the dance fee payment vouchers.

by comparing the amount of cash paid to the attorneys with the amount of cash paid to the class. The more valuable the class recovery, the greater the fees award. And vice versa.

But where class counsel is paid in cash, and the class is paid in some other way, for example, with coupons, comparing the value of the fees with the value of the recovery is substantially more difficult. Unlike a cash settlement, coupon settlements involve variables that make their value difficult to appraise, such as redemption rates and restrictions. For instance, *a coupon settlement is likely to provide less value to class members if . . . the coupons are non-transferable, expire soon after their issuance, and cannot be aggregated.* Of course, consideration of these variables necessarily increases the complexity of the district court's task—comparing the ultimate "value" of the coupon relief with the value of a proposed fees award. And perhaps more importantly, *the additional complexity also provides class counsel with the opportunity to puff the perceived value of the settlement so as to enhance their own compensation.* As one commentator succinctly put it, "[p]aying the class members in coupons masks the relative payment of the class counsel as compared to the amount of money actually received by the class members."

*In re HP Inkjet*, 716 F.3d at 1178–79 (second alteration in original) (emphases added) (footnotes omitted) (citations omitted) (quoting Christopher R. Leslie, *A. Market-Based Approach to Coupon Settlement in Antitrust and Consumer Class Action Litigation*, 49 UCLA L. Rev. 991, 1049 (2002)). Here, too, the dance fee payment vouchers had an expiration date, were not transferable, and required class members to do business with defendants again in order to redeem the dance fee payments. *See In re Easysaver*, 906 F.3d at 755 (noting that "potential for abuse is greatest when the coupons have value only if a class member is willing to do business again with the defendant who has injured her in some way," and "when the coupons expire soon" and "are not transferable" (quoting *In re Sw. Airlines Voucher Litig.*, 799 F.3d 701, 706 (7th Cir. 2015))).

Furthermore, the danger of unjustifiably inflating the settlement value of coupons is even more grave when the value of unused coupons will revert back to defendants. *See id.* ("[W]hen coupons that class members would not use were factored into the value of a settlement, they inflated the nominal size of a settlement fund without a concomitant increase in the actual value of relief for the class. And when a court relied on the size of such a settlement fund to calculate attorney's fees, this inflation dramatically increased the size of the fee award—allowing class counsel to reap the lion's share of the benefits." (citation omitted)). Unchecked, such reversions would allow defendants to create a larger coupon pool than they know will be claimed or used, just to inflate the value of the settlement and the resulting attorneys' fees, because they know that they will not be on the hook for the full coupon pool since the value of all unredeemed coupons will revert to them.

To guard against this danger and to align the interests of class counsel with the class, CAFA requires that "the portion of any attorney's fee award to class counsel that is attributable to the award of . . . coupons shall be based on the *value to class members* of the coupons that *are redeemed*." 28 U.S.C. § 1712(a) (emphasis added); *see also In re Easysaver*, 906 F.3d at 755 ("[R]equir[ing] district courts to consider the value of only those coupons 'that were actually redeemed' when calculating the relief awarded to a class . . . ensures that class counsel benefit only from coupons that provide actual relief to the class, lessening the incentive to seek an award of coupons that class members have little interest in using . . . ." (quoting *In re Online DVD-Rental*, 779 F.3d at 950)). In addition, to address the potential for large reversions—which allow defendants to keep more of their ill-gotten gains while still extinguishing class members' claims—CAFA also allows district courts to "require that a proposed settlement agreement provide for the distribution of a portion of the value of unclaimed coupons to 1 or more charitable or governmental organizations, as agreed to by the parties." 28 U.S.C. § 1712(e).

Here, however, the district court not only accepted the parties' $1 million valuation of the Dance Fee Payment Pool, but it also used that full valuation when performing the lodestar cross-check for attorneys' fees, despite the fact that all unclaimed and unredeemed dance fee payment vouchers would revert back to the defendants at the end of the two-year Dance Fee Redemption Period.[18] While we do not hold that the district court was bound by CAFA's requirements for

---

[18] The district court did not suggest to the parties that the unclaimed vouchers, or their cash equivalent, instead be distributed to a charitable organization.

coupon settlements, the district court was required to "scrutinize closely the relationship between attorneys' fees and benefit to the class" in order to "avoid awarding 'unreasonably high' fees simply because they are uncontested," *In re Bluetooth*, 654 F.3d at 948 (quoting *Staton*, 327 F.3d at 954), and "ensure that . . . counsel do not secure a disproportionate benefit 'at the expense of the unnamed plaintiffs who class counsel had a duty to represent,'" *Lane*, 696 F.3d at 819 (quoting *Hanlon*, 150 F.3d at 1027). Particularly in light of the fact that only 75 out of 865 class member claimants had requested dance fee payments totaling only $370,000 out of the $1 million Dance Fee Payment Pool, the district court should have done more to investigate whether the Dance Fee Payment Pool was really worth $1 million and was not unfairly inflating attorneys' fees.

For example, to ensure that the $1 million valuation of the Dance Fee Payment Pool's benefit to class members was not wildly inflated given that only $370,000 of that pool had been claimed (although not yet even redeemed), the district court could have asked the parties to provide information about how many class members who had not responded to the settlement were current dancers who might still claim part of the Residual Dance Fee Payment Pool. In addition, to better understand how the dance fee payment vouchers' expiration date potentially limited the vouchers' value, the district court might have inquired roughly how many scheduled Dates of Performance might be required to redeem the full $8,000 worth of vouchers that a class member could claim, and whether completing that many Dates of Performance within the two-year Dance Fee Redemption Period was realistic for the average class member. In other words, in response to concerns that the value of the Dance Fee Payment Pool had

been overestimated and was unfairly inflating the attorneys' fees award at the expense of the class, the district court had an obligation to scrutinize whether the purported value of the non-monetary relief would ever come to fruition, and to develop the record to support its $1 million valuation and address concerns that the dance fee payment vouchers were a "subtle sign[] that class counsel . . . allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *In re Bluetooth*, 654 F.3d at 947; *see also Dennis*, 697 F.3d at 868 ("The issue of the valuation of this aspect of a settlement must be examined with great care to eliminate the possibility that it serves only the 'self-interests' of the attorneys and the parties, and not the class, by assigning a dollar number to the fund that is fictitious.").

Next, Objectors also challenge the district court's acceptance of the parties' $1 million valuation of the injunctive relief that the settlement provides, arguing that the injunctive relief is essentially worthless because the supposedly changed business practices had already been adopted years prior to the settlement. The district court rejected this challenge, finding that the injunctive relief required "substantial" changes and provided "real benefits." However, the district court did not make any findings specifically justifying the $1 million dollar valuation, noting only that "there is an economic value that attaches to this portion of the settlement." Despite the district court's failure or inability to articulate any calculations to support the $1 million valuation of the injunctive relief portion of the settlement, the district court included that $1 million value in the total settlement value for purposes of its lodestar cross-check.

Our caselaw, however, demands that, because of the danger that parties will overestimate the value of injunctive relief in order to inflate fees, courts must be particularly careful when ascribing value to injunctive relief for purposes of determining attorneys' fees, and avoid doing so altogether if the value of the injunctive relief is not easily measurable. *See Staton*, 327 F.3d at 974 ("Precisely because the value of injunctive relief is difficult to quantify, its value is also easily manipulable by overreaching lawyers seeking to increase the value assigned to a common fund."). In *Staton*, we addressed a scenario where, like here, for purposes of comparing the putative common fund to the requested attorneys' fees, "the district court included in the value of the putative fund the parties' inexact, and quite probably inflated, estimate of the value of the proposed injunctive relief." *Id.* at 945. We held that, because of the difficulties of valuing injunctive relief and the concomitant dangers of inflated fees, "parties ordinarily may not include an estimated value of undifferentiated injunctive relief in the amount of an actual or putative common fund for purposes of determining an award of attorneys' fees." *Id.* at 946. Instead, "[t]he fact that counsel obtained injunctive relief in addition to monetary relief for their clients is . . . a relevant circumstance to consider in determining what *percentage* of the fund is reasonable as fees." *Id.* at 946 (emphasis added). "Only in the unusual instance where the value to individual class members of benefits deriving from injunctive relief can be accurately ascertained may courts include such relief as part of the value of a common fund for purposes of applying the percentage method of determining fees." *Id.* at 974.

Under this precedent, the district court here should have, for purposes of performing the lodestar cross-check using a percentage of the total class recovery, either: (1) explained

why the value of the injunctive relief's benefits to individual class members was readily quantifiable and worth $1 million, or (2) excluded the injunctive relief from the valuation of the settlement and explained why attorneys' fees of 31.6% ($950,000 out of $3 million, assuming for the sake of argument that the Dance Fee Payment Pool is worth $1 million, which may not be true) or more were justified. *See In re Bluetooth*, 654 F.3d at 945 ("If the lodestar amount overcompensates the attorneys according to the 25% benchmark standard, then a second look to evaluate the reasonableness of the hours worked and rates claimed is appropriate." (quoting *In re Coordinated Pretrial Proceedings*, 109 F.3d 602, 607 (9th Cir. 1997)).

In sum, to meet its procedural burden and to ensure that the settlement satisfied the heightened standard of fairness, the district court was required to scrutinize the clear sailing provision and the possibly pernicious reasons for its inclusion in the settlement. *See id.* at 948 ("By disregarding the contents of the clear sailing fee provision here, including both the disproportionate amounts negotiated and the reversionary kicker arrangement, the district court effectively 'delete[d]' it from the settlement—an approach that is beyond the scope of the court's discretion." (alteration in original) (quoting *Officers for Justice*, 688 F.2d at 630)). And particularly in light of the specter of implicit collusion raised by that provision, the district court had an obligation to question the disproportionate cash distribution to attorneys' fees, substantively address concerns that the settlement value was inflated, and clearly explain why the total benefits to the class justified the fees awarded. *See id.* at 949 ("Given the questionable features of the fee provision here, the court was required to examine the negotiation process with even greater scrutiny than is ordinarily demanded, and approval of the

settlement had to be supported by a clear explanation of why the disproportionate fee is justified and does not betray the class's interests.").

## B.  Incentive Payments

Another concerning aspect of the settlement that should have been subjected to heightened scrutiny are the $20,000 "General Release Enhancement Payments" awarded from the common fund to both Jane Roe 1 and Jane Roe 2 for their execution of a general release.  In contrast to the $5,000 service awards that Jane Roes 1 and 2 also received in recognition of their efforts to represent the class and secure a settlement, the $20,000 General Release Enhancement Payments appear to be completely divorced from any benefit or service to the class.  In fact, the Settlement Agreement explicitly states that these incentive payments are "consideration for [Jane Roes' 1 and 2] execution of a General Release Form."[19]

Yet neither the parties nor the district court cite any caselaw suggesting it is appropriate to draw such large amounts from the common fund to pay the named plaintiffs for what is essentially a side settlement between themselves and the defendants covering additional claims not covered in the class settlement.  To the contrary, we have noted that "special rewards for counsel's individual clients are not

---

[19] Through this General Release Form, Jane Roes 1 and 2 would individually—not on behalf of the class—release not only the claims released by all the other class members, but also "any other Claims under any provision of the FLSA, the California Labor Code . . . or any applicable California Industrial Welfare Commission Wage Orders, and Claims under all state or federal discrimination statutes . . . ."

permissible when the case is pursued as a class action. Generally, when a person 'join[s] in bringing [an] action as a class action . . . he has disclaimed any right to a preferred position in the settlement.'" *Staton*, 327 F.3d at 976 (alterations in original) (quoting *Officers for Justice*, 688 F.2d at 632); *see also id.* ("[W]hen representative plaintiffs make what amounts to a separate peace with defendants, grave problems of collusion are raised." (alteration in original) (quoting *Women's Comm. for Equal Employment Opportunity v. Nat'l Broad. Co.*, 76 F.R.D. 173, 180 (S.D.N.Y. 1977))).

Thus, while reasonable incentive awards are permitted, our cases have described such awards as being intended "to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez*, 563 F.3d at 958–59; *see also In re Online DVD-Rental*, 779 F.3d at 943 ("[I]ncentive awards that are intended to compensate class representatives for work undertaken on behalf of a class 'are fairly typical in class action cases.'" (quoting *Rodriguez*, 563 F.3d at 958)). We have therefore directed district courts to evaluate the propriety of requested incentive payments "using 'relevant factors includ[ing] the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, . . . the amount of time and effort the plaintiff expended in pursuing the litigation . . . and reasonabl[e] fear[s of] workplace retaliation.'" *Staton*, 327 F.3d at 977 (alterations in original) (quoting *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998))). None of those factors, nor any other benefit to the class, was used as a basis to justify the General Release Enhancement Payments here.

Moreover, the handsome amounts of those incentive payments, relative to the size of the cash payments that can be claimed by class members, raise serious red flags that the defendants may have tacitly bargained for the named plaintiffs' support for the settlement by offering them significant additional cash awards. *Cf. Staton*, 327 F.3d at 975 (finding that payments to certain identified class members that were "on average, sixteen times greater" than the damages that other unnamed class members would receive, and together made up roughly 6% of the total settlement, "raise[d] serious concerns as to [the settlement's] fairness, adequacy and reasonableness," particularly because there was "no sufficient justification in the record for this differential in the amount of damage awards and the process for awarding them"). We have repeatedly warned that

> excessive payments to named class members can be an indication that the agreement was reached through fraud or collusion. Indeed, "[i]f class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard."

*Id.* (alteration in original). Significantly, "[t]he danger is exacerbated if the named plaintiffs have an advance guarantee that a request for a relatively large incentive award will be made that is *untethered to any service or value they will provide to the class*." *Rodriguez*, 563 F.3d at 960 (emphasis added). That is exactly what appears to have happened here. Even though there is no indication that named plaintiffs' general release of their individual claims provides any value

to the class as a whole, the settlement agreement explicitly specified that the parties would request, and defendants would pay from the common fund, the $20,000 General Release Enhancement Payments.

In sum, not only do the $20,000 General Release Incentive Payments to Jane Roes 1 and 2 appear to be contrary to our caselaw on incentive payments, but they also raise concerns about a potential conflict of interest between the class representatives and unnamed class members. That conflict arises because, "[i]f . . . members of the class are provided with special 'incentives' in the settlement agreement, they may be more concerned with maximizing those incentives than with judging the adequacy of the settlement as it applies to class members at large." *Staton*, 327 F.3d at 977; *see also Rodriguez*, 563 F.3d at 959–60 ("[T]he incentive agreements disjoined the contingency financial interests of the contracting representatives from the class . . . [and] created a disincentive to go to trial; going to trial would put their [large incentive payments] at risk in return for only a marginal individual gain even if the verdict were significantly greater than the settlement."). As a result, the district court should have closely scrutinized these General Release Enhancement Payments to ensure that they were justified under our precedent, did not create an impermissible conflict of interest, and were not the result of implicit collusion. *Cf. Rodriguez*, 563 F.3d at 959 ("An absence of material conflicts of interest between the named plaintiffs and their counsel with other class members is central to adequacy and, in turn, to due process for absent members of the class.").

## C.  Reversionary Aspects

The concerns raised by the above-described aspects of the settlement are further compounded by the settlement's inclusion of reversionary funds, namely, the Second Tier Cash Pool and the Dance Fee Payment Pool.[20]  While we have not disallowed reversionary clauses outright, we generally disfavor them because they create perverse incentives. *See In re Volkswagen*, 895 F.3d at 611–12.  For example, allowing unclaimed funds to revert to defendants even where class members who do not respond or submit a claim are bound by the class release creates an incentive for defendants to ensure as low a claims rate as possible so as to maximize the funds that will revert.[21]  This perverse incentive might lead defendants to negotiate for a subpar notice process, a more tedious claims process, or restrictive claim

---

[20] "A 'kicker' or reversion clause directs unclaimed portions of a settlement fund . . . to be paid back to the defendant." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 895 F.3d 597, 611 (9th Cir. 2018).  Here, the defendants were not required to fund the Second Tier Cash Pool of up to $1 million, unless enough class members submitted claims to push the total of all claims and fees above the $2 million amount provided by the First Tier Cash Pool.  In other words, the promised Second Tier Cash Pool money would revert back to the defendants if the claims rate was sufficiently low, even though the non-FLSA claims of all class members who did not make a claim or opt out would nonetheless be extinguished.  Similarly, as discussed above, any amount of the Dance Fee Payment Pool or Residual Dance Fee Payment Pool that was not redeemed within the two-year Dance Fee Redemption Period would also revert to the defendants.

[21] By contrast, in an opt-in settlement the defendants retain an incentive to ensure a high claims rate, because any class member who does not opt in and make a claim is also not subject to the release, meaning that a low claims rate leaves defendants with the specter of unresolved liability to all class members who did not opt in.

eligibility conditions.  *See id.* at 611.  Moreover, "[a] reversion can benefit both defendants and class counsel, and thus raise the specter of their collusion, by (1) reducing the actual amount defendants are on the hook for, especially if the individual claims are relatively low-value, or the cost of claiming benefits relatively high; and (2) giving counsel an inflated common-fund value against which to base a fee motion."  *Id.*  As a result, we have identified reversionary clauses as a "subtle sign[] that class counsel have allowed pursuit of their own self-interests . . . to infect the negotiations."  *Allen*, 787 F.3d at 1224. (alteration in original) (quoting *In re Bluetooth*, 654 F.3d at 947).

That is not to say that a reversionary clause can never reasonably be included in a settlement; in some cases, the reversionary clause may provide articulable benefits to the class, and any concerns about perverse incentives or collusion may be ameliorated by other aspects of the settlement.  *See, e.g.*, *In re Volkswagen*, 895 F.3d at 612 ("The incentives for class members to participate in the settlement, the complementary inducement for Volkswagen to encourage them to participate, the value of the claims, and the actual trend in class member participation all indicate that the reversion clause did not, in design or in effect, allow VW to recoup a large fraction of the funding pool.").  But that is not the case here.  Instead, the lackluster notice process, the relatively low claims rate, the restrictive conditions on redeeming dance fee payments, and a fee award that constituted a disproportionate share of the cash distribution and was based in part on funds subject to reversion, made concerns regarding perverse incentives and implicit collusion raised by the reversionary clause all the more salient.

As a result, the district court had an obligation to scrutinize these reversionary clauses closely and seek adequate justification for their inclusion; it was required to "explain why the reversionary component of a settlement negotiated before certification is consistent with proper dealing by class counsel and defendants."[22]   *In re Volkswagen*, 895 F.3d at 612; *see also In re Bluetooth*, 654 F.3d at 949 (explaining that when a district court was faced with a "questionable" provision, it "was required to examine the negotiation process with even greater scrutiny than is ordinarily demanded, and approval of the settlement had to be supported by a clear explanation of why the [provision] is justified and does not betray the class's interests").   The district court failed to do so here.   In its approval order, the district court appeared to justify the reversionary aspects of the Second Tier Cash Pool simply by stating that "the Tier One funds are not reversionary."   But just because some of the settlement funds are not reversionary does not explain why a third of the potential cash settlement funds should be, *see In re Bluetooth*, 654 F.3d at 949 ("If the defendant is willing to pay a certain sum . . . , there is no apparent reason the class should not benefit from the excess allotted . . . ."), nor does it do anything to address the

---

[22] This cautionary approach to reversionary clauses is also reflected in the Northern District of California's own guidance for class action settlements. *See Procedural Guidance for Class Action Settlements*, N.D. CAL., https://cand.uscourts.gov/ClassActionSettlementGuidance (last updated Dec. 5, 2018) (instructing that, "[i]n light of Ninth Circuit case law disfavoring reversions," parties should state in their motion for preliminary approval "whether and under what circumstances money originally designated for class recovery will revert to any defendant, the potential amount or range of amounts of any such reversion, and *an explanation as to why a reversion is appropriate in the instant case*" (emphasis added)).

substantive concerns regarding perverse incentives and potential collusion discussed above. The district court therefore failed to satisfy its procedural obligation to probe more closely the reversionary clauses, by investigating whether those clauses are justified by unique benefits to the class and supported by provisions that ameliorate concerns about perverse incentives, in order to dispel any concerns that the clauses are the result of implicit collusion or self-serving dealings.

## D. Overall Fairness Determination

The foregoing questionable aspects of the settlement—the clear sailing agreement, the disproportionate cash distribution to attorneys' fees justified in part by potentially inflated non-monetary relief, the large incentive awards to Jane Roes 1 and 2, and the reversionary clauses—squarely illustrate our concerns why settlements negotiated prior to class certification are subject to a heightened risk that self-interest, even if not purposeful collusion, will seep its way into the settlement terms. *See Staton*, 327 F.3d at 960. These identified "subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations," *In re Bluetooth*, 654 F.3d at 947, should have caused the district court to think twice, investigate further, and justify the terms' inclusion before approving the settlement as "fair, reasonable, and adequate." *See Allen*, 787 F.3d at 1224 ("While the existence of [subtle warning] signs [including a reversionary clause, clear sailing agreement, and disproportionate attorneys' fee] does not mean the settlement cannot still be fair, reasonable, or adequate, they required the district court to examine them, and adequately to develop the record to support its final approval decision."). Such a heightened inquiry was all the

more imperative here, where concerns raised by the potentially problematic aspects of the settlement were not offset by an exceptional recovery to the class.[23]

Ultimately, because the district court applied the incorrect legal standard in determining whether to approve the settlement—it failed to conduct the required heightened inquiry and instead suggested that a presumption of fairness applied—we hold that the district court abused its discretion in granting approval of the settlement. *See Allen*, 787 F.3d at 1224.

## CONCLUSION

For the foregoing reasons, we reverse the district court's approval of the settlement notice process and the settlement itself, including the attorneys' fees award, and remand for further proceedings consistent with this opinion. We leave it to the district court to determine how to proceed, whether that be negotiating a new settlement, seeking re-approval of the current settlement with a new notice plan under the applicable

---

[23] While appellate courts are not well suited to estimate the value of the settlement compared to the full potential value of the class claims, *see Staton*, 327 F.3d at 959, here the district court itself suggested in its final approval order that the gross settlement value (including the Dance Fee Payment Pool and the injunctive relief valued by the court at $2 million) amounts to 4.3% of possible class damages. While "[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair," *Officers for Justice*, 688 F.2d at 628, this recovery is not so large as to extinguish the fairness concerns raised by the clear sailing agreement, the disproportionate cash distribution to attorneys' fees, the large incentive awards to Jane Roes 1 and 2, and the reversionary clauses.

heightened standard, reinstating the prior Ninth Circuit appeal, or proceeding toward trial.

**REVERSED and REMANDED.**