# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| JEFFRIE ALAN SUMMERS II, on behalf of himself and all other similarly situated,<br><br>Respondent,<br><br>v.<br><br>SEA MAR COMMUNITY HEALTH CENTERS,<br><br>Respondent,<br><br>MARIA BARNES, objector to class action settlement,<br><br>Appellant. | No. 84910-7-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

BIRK, J. — Maria Barnes appeals an order granting final approval to a class action settlement, challenging the superior court's denial of her motion to consolidate six class action lawsuits against the defendant, approval of the class notice plan, and approval of the settlement as fair, reasonable, and adequate. We hold the superior court acted within its discretion in making each ruling. First, when the court entertained consolidation, the proponents of two other pending actions had reached a preliminary settlement with the defendant, and the superior court had the discretion to review the potential settlement first, before coordinating the pending actions. Second, the parties agreed the class would be difficult to reach, and the superior court appropriately considered that difficulty in approving the class

notice plan as affording the best notice practicable under the circumstances. Last, in arguing that the settlement fell outside the range the superior court had discretion to approve as fair, reasonable, and adequate, Barnes fails to point to more than a speculative possibility that a better settlement might have been achieved. We affirm.

I

Sea Mar Community Health Centers is a nonprofit organization that provides healthcare services to low-income, underserved, and under- and uninsured communities in Washington. On June 24, 2021, Sea Mar learned from the United States Department of Health and Human Services (HHS) that it had suffered a data security breach when certain data had been copied by an unauthorized actor. On October 29, 2021, Sea Mar sent a notice letter to patients that identified highly sensitive personal and protected health information, such as social security numbers and medical records, that may have been involved in the data security incident. The accessed data potentially impacted 1.2 million Sea Mar patients, guarantors, and employees and included social security numbers for 163,499 individuals. There is no evidence of misuse of any information or that any of the data has been purchased by cybercriminals.

Between mid-November 2021 and early February 2022, plaintiffs filed six separate class action lawsuits against Sea Mar in King County Superior Court.[1]

---

[1] Barnes v. Sea Mar Comty. Health Ctrs., No. 21-2-15063-9 SEA (King County Super. Ct. Wash. filed Nov. 12, 2021); Hall v. Sea Mar Comty. Health Ctrs, No. 21-2-15130-9 SEA (King County Super. Ct. Wash. filed Nov. 12, 2021); Lopez v. Sea Mar Comty. Heath Ctrs., No. 21-2-16263-7 SEA (King County Super Ct. Wash. filed Dec. 13, 2021); Waliany v. Sea Mar Comty. Heath Ctrs., No. 21-2-

Maria Barnes and Derek Gannon filed the first action. Only Jeffrie Summers's complaint is before us on appeal, which, based on the data breach incident described above, alleged several Washington common law and statutory claims against Sea Mar. Summers and Alan Hall were represented by the same counsel in different lawsuits and later submitted filings jointly. On January 14, 2022, according to a Sea Mar attorney's declaration, Hall served Sea Mar with discovery requests. On the due date for response, according to the same declaration, Sea Mar responded by producing responsive documents. On February 8, 2022, Sea Mar notified HHS of the pending litigation and requested certification that Sea Mar acted within the scope of a deemed public health services employee. Barnes v. Sea Mar Cmty. Health Ctrs., No. 2:22-181-RSL-TLF, 2022 WL 1541927, at *1 (W.D. Wash. Apr. 27, 2022) (report and recommendation). On February 11, 2022, a U.S. attorney filed a notice pursuant to 42 U.S.C. § 233(l)(1) advising the superior court that the United States was considering whether the United States would intervene in the action. Id.

On February 14, 2022, Barnes[2] filed a motion to consolidate the six pending class action lawsuits. In a declaration supporting the motion, Barnes's counsel stated he contacted counsel for plaintiffs in the other five actions and obtained consent from counsel in the Lopez and Waliany actions to a stipulated

---

16813-9 SEA (King County Super. Ct. Wash. filed Dec. 23, 2021); Summers v. Sea Mar Comty. Health Ctrs., No. 22-2-00773-7 SEA (King County Super Ct. Wash. filed Jan. 14, 2022); Maynor v. Sea Mar Comty. Health Ctrs., No. 22-2-01713-9 SEA (King County Super. Ct. Wash. filed February 2, 2022).

[2] Throughout the proceedings in the trial court, different plaintiffs joined at different times in different filings. We omit those not necessary to the discussion.

consolidation. Counsel for plaintiff in <u>Hall</u> did not agree to consolidation, counsel for plaintiff in <u>Summers</u> declined to respond, and counsel for plaintiff in <u>Maynor</u> never provided a position on consolidation.

On February 16, 2022, Sea Mar filed notices of removal of <u>Summers</u> and <u>Barnes</u> to federal court. <u>Barnes</u>, 2022 WL 1541927, at *1. In its notice of removal of action under 28 U.S.C. § 1346(b)(1), Sea Mar argued the Public Health Services Act (PHSA) and Federally Supported Health Centers Assistance Act (FSHCAA), 42 U.S.C. § 233(a), granted Sea Mar immunity from liability and Summers's only redress was to sue the United States in federal court as Summers's claims fell under the Federal Tort Claims Act, 28 U.S.C. § 1346(b). On February 28, 2022, the superior court struck Barnes's motion to consolidate, noting Sea Mar had sought removal to federal court.

On March 29, 2022, Hall, Summers, and Sea Mar engaged in an unsuccessful mediation. A former federal judge served as the parties' mediator. Before mediation, Sea Mar "provided formal discovery related to the merits of Plaintiffs' claims, potential defenses," and the parties "discussed their respective positions on the merits of the claims and class certification." Following the unsuccessful mediation, the parties continued negotiations and accepted a mediator's proposal to settle the class claims.

By April 18, 2022, Hall, Summers, and Sea Mar signed a settlement agreement and release. The settlement was subject to court approval. The agreement would release, discharge, and bar all claims asserted or that could have been asserted in the <u>Hall</u> lawsuit or any related action, including <u>Barnes</u>, <u>Lopez</u>,

4

Waliany, Summers, and Maynor. Under the terms of the agreement, Sea Mar would provide compensation for unreimbursed "Ordinary Losses" to a total of $2,500.00 per person upon submission of a timely, complete, and valid claim form with necessary supporting documentation. In the alternative, class members may make a claim for a $100.00 cash payment. Class members who suffer "Extraordinary Losses" are "also" eligible to receive reimbursement up to $25,000.00. The agreement entitles all settlement class members to enroll in IDX Identity Protection Services for three years of three-bureau credit monitoring. IDX carries a $1 million policy that protects the subscriber, monitors the dark web, and provides identity restoration services. Sea Mar funded a non-reversionary settlement fund totaling $4,400,000.00. If the total of settlement payments, IDX protection services, attorney fees and costs, and other fixed settlement costs does not exceed the settlement fund, all remaining funds will be distributed on a pro rata basis to all settlement class members who submit a valid claim up to an additional $100.00 for each claimant. Any remaining funds after that distribution will be paid to a cy pres recipient to be agreed upon by the parties and subject to court approval.

For class notice, the proposed settlement stated, "[T]he Settlement Administrator shall disseminate" postcard notice "via [U.S. Postal Service] First Class Mail to all Settlement Class Members." This was to be done using "addresses provided by Sea Mar" and after those addresses had been updated with the National Change of Address database. In addition, the settlement

administrator was to establish a settlement website and a toll-free telephone number for the class members to obtain information.

On April 27, 2022, United States Magistrate Judge Theresa Fricke entered a report and recommendation. Barnes, 2022 WL 1541927, at *1. According to the report, the United States filed two notices advising the court that it determined Sea Mar was not deemed a Public Health Service employee under 42 U.S.C. § 233 and removal was procedurally improper. Id. The magistrate judge recommended the court find that removal under the FSHCAA was procedurally deficient and 42 U.S.C. § 233 did not confer subject matter jurisdiction over the action. Id. at *2. The magistrate judge recommended Sea Mar's motion to stay be denied because a stay is automatic only when an action is properly removed under 42 U.S.C. § 233(l)(2). Id. at *3.

On May 4, 2022, Sea Mar filed a joint motion to remand Summers back to King County Superior Court, which the federal court granted the following day. On May 16, 2022, United States District Judge Robert Lasnik entered an order adopting Judge Fricke's report and recommendation and remanded Barnes back to King County Superior Court. Barnes v. Sea Mar Cmty. Health Ctrs., No. C22-0181RSL-TLF, 2022 WL 1540462, at *1 (W.D. Wash. May 16, 2022) (court order).

On May 20, 2022, Barnes filed a motion to consolidate her lawsuit with Summers and Hall. Barnes argued the remaining three lawsuits should be consolidated after remand from federal court. Hall, Summers, and Sea Mar opposed Barnes's motion because "consolidation under CR 42(a) is unwarranted"

6

since "this class action case has been settled." On June 3, 2022, the superior court denied Barnes's motion to consolidate.

On June 17, 2022, Summers, on behalf of himself, Hall, and Wright, filed an "Unopposed Motion for Preliminary Approval of Class Action Settlement and Memorandum in Support." On June 29, 2022, Barnes filed a motion to intervene in Summers and an objection to Summers's motion for preliminary approval. In opposing Summers's motion, Barnes argued Hall, Summers, and Sea Mar had entered into a collusive settlement that should be rejected, and the court should consolidate the pending actions. The superior court granted Summers's motion for preliminary approval of class action settlement. The order appointed the attorneys for Hall and Summers as class counsel and appointed Kroll Business Services as the settlement administrator. The court approved the proposed notice plan. The court denied Barnes's motion to intervene. Later, Barnes filed an objection to final approval of the class action settlement, arguing the proposed settlement was not fair, reasonable, and adequate.

Hall and Summers subsequently filed a motion for final approval of the settlement. Before the final fairness hearing, the settlement administrator engaged in an online media campaign on Facebook and Instagram[3] in English and Spanish, which was substantially completed in a month and generated over eight million impressions. At the time of the final fairness hearing, 6,210 claims forms had been received out of a possible 1,179,596 class members, representing a response rate of approximately 0.5 percent. As to Barnes's objection, the court ruled that "[w]hile

---

[3] Instagram is a social media platform for sharing photographs.

the Court denies the objection," it found that "valid objections exist." The court explained that "[o]n balance . . . the Court finds the settlement to be fair, adequate, and reasonable." The court entered a final order and judgment granting final approval of the class action settlement. The court also granted Summers's motion for attorney fees, costs, and service award.

Barnes appeals.

II

Class actions are governed by CR 23. Washington's CR 23 was once "an exact counter-part" of Rule 23 of theFederal Rules of Civil Procedure (Fed. R. Civ. P.). Johnson v. Moore, 80 Wn.2d 531, 532, 496 P.2d 334 (1972). The court stated the Washington rule was "identical" to the federal rule in Lacey Nursing Center, Inc. v. Department of Revenue, 128 Wn.2d 40, 46-47, 905 P.2d 338 (1995), Pickett v. Holland America Line-Westours, Inc., 145 Wn.2d 178, 188, 35 P.3d 351 (2001), and Schnall v. AT & T Wireless Services, Inc., 171 Wn.2d 260, 271, 259 P.3d 129 (2011). CR 23 is no longer "identical" to Fed. R. Civ. P. 23 because of amendments to the federal rule. However, Washington courts may look to federal decisions in applying the Washington rules of civil procedure when the Washington and federal rules are "substantially similar." Bryant v. Joseph Tree, Inc., 119 Wn.2d 210, 218-19, 829 P.2d 1099 (1992). In class actions, Washington courts have long looked to federal authority. See DeFunis v. Odegaard, 84 Wn.2d 617, 622-23, 529 P.2d 438 (1974); Johnson, 80 Wn.2d at 533. It remains appropriate to consider federal decisions in applying CR 23 when there is not a Washington decision speaking to the issue, the text of the two rules does not indicate

divergence, and the rules in respect to their goals and purposes remain substantially similar.

At the outset, Barnes takes issue with the superior court's interlineation of its observation that Barnes presented "valid" objections, but that, "on balance" the settlement was fair, adequate, and reasonable. Barnes argues if the court found "any part" of her objections valid, "it could not have appropriately approved" the settlement. We reject this characterization of the superior court's interlineation. During the hearing on final approval of the class settlement, the superior court expressed concern about the adequacy of notice, the content of the release, and the removal to federal court. In context, the superior court's interlineation shows, consistent with the final fairness hearing transcript, the court made the appropriate searching inquiry into concerns that were validly presented for the protection of absent class members, but concluded the settlement met those concerns and properly served the class's interest.

A

Barnes argues the superior court abused its discretion by denying her motion to consolidate the six actions. We disagree.

When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions, or may order the actions consolidated. CR 42(a). The rule allows a trial court to make such orders "as may tend to avoid unnecessary costs or delay." Id. CR 42(a) is permissive. See Leader Nat'l Ins. Co. v. Torres, 51 Wn. App. 136, 142, 751 P.2d 1252 (1988), affirmed, 113 Wn.2d 366, 779 P.2d 722

(1989). Consolidation is within the discretion of the trial court. Nat'l Bank of Wash. v. Equity Inv'rs, 86 Wn.2d 545, 560, 546 P.2d 440 (1976). A decision denying consolidation will be affirmed unless there has been an abuse of discretion, and the moving party shows prejudice. Id. A superior court abuses its discretion when its decision is manifestly unreasonable, based on untenable grounds, or based on untenable reasons. State v. Dye, 178 Wn.2d 541, 548, 309 P.3d 1192 (2013).

Barnes sought to have the court organize the six actions and plaintiffs' counsel to pursue the claims against Sea Mar in common. The Manual for Complex Litigation, Fourth, published in 2004, was produced under the auspices of the Federal Judicial Center, and contains analyses and recommendations of its board of editors. FED. JUD. CTR., MANUAL FOR COMPLEX LITIGATION, at 1 (4th ed. 2004) (Manual), https://www.fjc.gov/sites/default/files/materials/30/Manual%20for%20Complex%20Litigation_Fourth%20Edition_Third%20Printing_2020.pdf. The Manual is not "authoritative legal or administrative policy," but sets forth only "recommendations and suggestions." Id. Barnes cited section 22.62 of the Manual, which discusses the organization of counsel. It states, "The judge will often need to appoint lead counsel or a committee of counsel to coordinate discovery and other pretrial preparation." Id. § 22.62, at 405-06. After discussing the role of lead counsel and committees of counsel, the Manual states, "Where several counsel are competing to be lead counsel or to serve on a key liaison committee, the court should establish a procedure for attorneys to present their qualifications, including their experience in managing complex litigation." Id. at 406. In a complex case, lead counsel assume major responsibility on behalf of the

10

class for presenting written and oral arguments, working with opposing counsel in developing and implementing plans for the litigation, initiating and organizing discovery, conducting depositions, and employing experts, among other tasks. In re Ivan F. Boesky Sec. Litig., 948 F.2d 1358, 1365 (2d Cir. 1991). Appointing a single negotiator authorized to speak for the class eliminates opportunities for "divisive settlement shopping" by the defendant. Id. (citing MacAlister v. Guterma, 263 F.2d 65, 68-69 (2d Cir. 1958)).

One of the ways in which current Fed. R. Civ. P. 23 differs from Washington's rule is in establishing express considerations relevant to the appointment of class counsel. Fed. R. Civ. P. 23(g). Washington's CR 23 lacks similar express considerations, stating only, in CR 23(a)(4), that the representative parties must fairly and adequately protect the interests of the class. The federal rule states additionally, in reference to class counsel, "If more than one adequate applicant seeks appointment, the court must appoint the applicant best able to represent the interests of the class." Fed. R. Civ. P. 23(g)(2). And, "[t]he court may designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action." Fed. R. Civ. P. 23(g)(3). These appointments turn on "the same factors" used to appoint class counsel generally. E.g. In re Vanguard Chester Funds Litig., 625 F. Supp. 3d 362, 365 (E.D. Pa. 2022). While the provisions of Fed. R. Civ. P. 23(g) are more specific, Washington law is consistent. It requires that class counsel be "qualified, experienced, and generally able to conduct the litigation." Marquardt v. Fein, 25 Wn. App. 651, 656-57, 612 P.2d 378 (1980) (citing Eisen v. Carlisle & Jacquelin,

11

391 F.2d 555, 562 (2d Cir. 1968)). Because the court has responsibility for "insuring adequate representation" of the class, the court may appoint lead counsel adequate to the complexity of an action. Id.

At the time of Barnes's motion to consolidate, Hall and Summers's preliminary settlement subject to court approval stood to potentially eliminate the need for future litigation on behalf of the class, and therefore the need for efficiencies associated with designating lead counsel to manage litigation tasks. At any point at which it seemed probable that future litigation would occur that would benefit from consolidation and appointment of lead counsel, the superior court might have revisited the question of consolidation. But when a settlement, if approved, had the potential to resolve the class's claims, the superior court acted within its discretion in denying consolidation where it would not save cost or time, and to the contrary could delay review of the preliminary settlement. Further, Barnes was not prejudiced, because her opportunity to opt out of or object to the class settlement was preserved. The superior court did not abuse its discretion by denying consolidation in the circumstances presented.[4]

---

[4] The order denying consolidation did not state a basis for the superior court's ruling. To the extent this was error it was harmless because "there is evidence to support the decision in the pleadings and proof," In re Dependency of N.G., 199 Wn.2d 588, 600, 510 P.3d 335 (2022), and because Barnes's right to object was preserved it affirmatively appears from the record that no injustice occurred, see Foster v. Carter, 49 Wn. App. 340, 343, 742 P.2d 1257 (1987) (no injustice occurred where the superior court waived rules concerning the time to file a summary judgment motion because appellant had received appropriate notice).

B

Barnes argues the class notice plan was not the best notice practicable under the circumstances, and in fact, " 'failed.' "[5] We disagree.

A class action may not be settled without notice to the class. CR 23(e). In a class action maintained under CR 23(b)(3), the court is required to "direct to class members 'the best notice practicable under the circumstances including individual notice to all members who can be identified through reasonable effort.' " Eisen v. Carlisle, 417 U.S. 156, 173, 94 S. Ct. 2140, 40 L. Ed. 2d 732 (1974) (quoting Fed. R. Civ. P. 23(c)(2)); CR 23(c)(2); Sitton v. State Farm Mut. Auto. Ins. Co., 116 Wn. App. 245, 252 n.11, 63 P.3d 198 (2003). This is notice " 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.' " Roes, 1-2 v. SFBSC Mgmt., LLC, 944 F.3d 1035, 1045 (9th Cir. 2019) (internal quotation marks omitted) (quoting Eisen, 417 U.S. at 174). It requires the means one " 'might reasonably adopt' " when " 'desirous of actually informing the absentee.' " Id. at 1045-46 (quoting Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 315, 70 S. Ct. 652, 94 L. Ed. 865 (1950)).

The Advisory Committee note to the 2018 amendments to Fed. R. Civ. P. 23(c)(2) addressed the evolution in technology since the U.S. Supreme Court addressed the notice requirement in Eisen. While its individual notice requirement

---

[5] Barnes does not challenge on appeal the content of the notice. Accordingly, we do not address its adequacy. See Nobl Park, LLC. of Vancouver v. Shell Oil Co., 122 Wn. App. 838, 845, 95 P.3d 1265 (2004) (setting out requirements for adequacy of notice) (citing Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 812, 105 S. Ct. 2965, 86 L. Ed. 2d 628 (1985)).

for identifiable class members led to frequent resort to first class mail, "technological change since 1974 has introduced other means of communication that may sometimes provide a reliable additional or alternative method for giving notice." Fed. R. Civ. P. 23(c)(2), Committee Note 2018. The committee commented that "when selecting a method or methods of giving notice courts should consider the capacity and limits of current technology, including class members' likely access to such technology." Id. The focus should be on the "the means or combination of means most likely to be effective in the case before the court." Id.

"[T]he superior court exercises discretion under CR 23(d) in crafting an appropriate procedure for giving notice of a class action." Wright v. Jeckle, 121 Wn. App. 624, 629 n.1, 90 P.3d 65 (2004). This accords with the abuse of discretion standard that we apply generally when reviewing a superior court ruling that a class settlement was fair, adequate, and reasonable. Pickett, 145 Wn.2d at 192; Deien v. Seattle City Light, 26 Wn. App. 2d 57, 66, 527 P.3d 102 (2023). We therefore review for abuse of discretion the superior court's determination that the notice plan was the best notice practicable under the circumstances.[6]

[6] Consistent with Wright, Pickett and Deien, the parties agree that we review the superior court's approval of class notice under the abuse of discretion standard. We note appellate courts are divided on the standard of review that applies to orders concerning class notice. Some courts view the notice requirement as calling on the trial court to assess and adopt a plan from among the "feasible alternative[s]" suitable to a particular case for "identifying and contacting persons" in the class, and apply an abuse of discretion standard. In re Agent Orange Prod. Liab. Litig. MDL No. 381, 818 F.2d 145, 169 (2d Cir. 1987); see also Pollard v. Remington Arms Co., 896 F.3d 900, 905-06 (8th Cir. 2018) (abuse of discretion); In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions, 148 F.3d 283, 318 (3d Cir. 1998) (abuse of discretion). Similarly, the Advisory

Sea Mar's counsel described Sea Mar's patient population as a "low income, no income homeless population," and described the population as "a difficult population to reach generally." Sea Mar's counsel stated the difficulty in reaching the class was anticipated and was the reason Hall and Summers "insisted on a cy pres provision," because the settling parties "suspected that there was going to be a large number that did not respond regardless of what we did." This echoes Roes, 1-2, in which the parties "appeared to believe" when formulating a notice plan that the class members would be "difficult to reach." 944 F.3d at 1046.

In Roes, 1-2, plaintiffs sought approval of a settlement on behalf of nearly 4,700 exotic dancers at adult entertainment clubs based on their allegedly having been misclassified as independent contractors rather than employees. Id. at 1039. Despite believing class members would be difficult to reach, and that former employees in particular would be "difficult to reach by mail," the notice plan relied

---

Committee note to the 2018 amendments to Fed. R. Civ. P. 23(c)(2) states, "The court should exercise its discretion to select appropriate means of giving notice."

Other courts view the issue as whether the notice satisfies due process, deemed a question of law reviewed de novo. In re Online DVD-Rental Antitrust Litig., 779 F.3d 934, 946 (9th Cir. 2015) (de novo); Fidel v. Farley, 534 F.3d 508, 513 (6th Cir. 2008) (de novo); DeJulius v. New England Health Care Emp. Pension Fund, 429 F.3d 935, 942 (10th Cir. 2005) (de novo); Fauley v. Metro. Life Ins. Co., 2016 IL App (2d) 150236, ¶ 36, 52 N.E.3d 427, 402 Ill. Dec. 506 (de novo).

The California Court of Appeal uses a mixed standard, stating, "The trial court 'has virtually complete discretion as to the manner of giving notice to class members,' " a determination reviewed for abuse of discretion, but " '[t]o the extent the trial court's ruling is based on assertedly improper criteria or incorrect legal assumptions, we review those questions de novo.' " Cellphone Fee Termination Cases, 186 Cal. App. 4th 1380, 1390, 113 Cal. Rptr. 3d 510 (2010) (internal quotation marks omitted) (quoting 7-Eleven Owners for Fair Franchising v. Southland Corp., 85 Cal. App. 4th 1135, 1164, 102 Cal. Rptr. 2d 777 (2000); Cho v. Seagate Tech. Holdings, Inc., 177 Cal. App. 4th 734, 745, 99 Cal. Rptr. 3d 436 (2009)).

on U.S. mail to the class members' last known addresses. Id. at 1042, 1046. The notice plan included, additionally, performing address traces and re-sending when 1,546 notices were returned as undeliverable, establishing a settlement website, and displaying posters in the dressing rooms at the nightclubs. Id. at 1042. The notice plan included no reminder notices, no follow up, and no electronic notice, and after the address traces 560 notices remained undeliverable. Id.

The Ninth Circuit reversed the district court's approval of the notice plan. Id. at 1046, 1048. The court was troubled by the parties' use of U.S. mail without any additional means of notice despite believing beforehand that the class, especially former employees, would be difficult to reach that way, and knowing afterwards that 12 percent of the class received no notice. Id. at 1046. This was exacerbated by the notice plan's failure to employ any electronic means of notice, or offer any reminder notice. Id. The supplemental notice consisting of posters displayed at the night clubs would alert only current employees, and in no way answered the difficulty understood to exist in reaching former employees. Id. at 1046-47. Finally, there were "numerous other reasonable options that could have been pursued to improve the notice process," identified as social media, targeted online advertising, and online message boards such as at a website dedicated to the exotic dancer community. Id. at 1047. Between the known limitations of the plan that was implemented together with the neglect of available options to ameliorate those limitations, the court held "something more was required" to meet the standard of the " 'best notice practicable.' " Id. at 1048.

While the parties here also anticipated difficulty in reaching the class, they did not rely on only one means of reaching the class, let alone as in Roes, 1-2 a particular means they believed in advance would be ineffective. The parties here did "something more" than the parties did in Roes, 1-2, by using first class mail when addresses were known and using e-mail when e-mail addresses were known,[7] establishing a website and toll-free telephone number, and using online advertising on Facebook and Instagram in English and Spanish. Over eight million impressions were delivered via the Facebook and Instagram advertising campaigns. The record does not indicate a design in the social media advertising to target groups likely to overlap with the class, and does not indicate the existence of a website known to be used by a community overlapping with the class, but with those exceptions the notice employed here did use the "numerous other reasonable options" insofar as those are identified in Roes, 1-2.

Additionally, as Sea-Mar argued, the superior court was entitled to consider the nonreversionary nature of the settlement when evaluating a notice plan for a

---

[7] Barnes argues that Hall and Summers improperly deviated from the notice plan approved by the court when Kroll e-mailed notices to 180,513 e-mail addresses on file for the class members. Of the 180,513 e-mail addresses contacted, 34,205 "were rejected/bounced back," and Kroll was able to follow up with first class mail notice to 33,070 of those recipients. This case differs from Roes, 1-2 in that the settling parties here used e-mail addresses if they had them, otherwise postal addresses, and then postal addresses if available for defective e-mail addresses. Better practice would have been to return to court to obtain approval of the procedure actually employed, but Barnes fails to show prejudice from any deviation from the original plan. In effect, Barnes argues that substituting e-mail for first class mail notice for approximately 13 percent of the class was improper. When coupled with Barnes's argument that first class mail was inadequate, this impliedly amounts to an argument that only sending *both* e-mail and first class mail when such addresses were known could have potentially satisfied CR 23. Barnes cites no authority supporting this contention.

class known to be difficult to reach. Funds unclaimed by class members do not revert to Sea Mar, but must be paid over to an appropriate cy pres recipient. See CR 23(f)(2) (directing residual funds to "programs that promote access to the civil justice system for low income residents of Washington" and for purposes that relate to "the objectives of the underlying litigation or otherwise promote the substantive or procedural interest of members of the certified class."). This also distinguishes Roes, 1-2, in which significant amounts of the proposed class settlement would never be funded or would revert to the defendants if not claimed by the class members. 944 F.3d at 1040-41. When the "distribution of unclaimed funds" is designed to "indirectly benefit the entire class," the court may consider this as a factor mitigating the infeasibility of providing individual notice to persons who are difficult to reach, while still giving them the benefits of the class form. See Six (6) Mexican Workers v. Ariz. Citrus Growers, 904 F.2d 1301, 1305 (9th Cir. 1990) ("Fluid recovery or 'cy pres' distribution avoids these difficulties by permitting aggregate calculation of damages, the use of summary claim procedures, and distribution of unclaimed funds to indirectly benefit the entire class."). Factoring the cy pres provision into the evaluation of the notice plan is appropriate to the purpose of cy pres distributions, which are justified when a recovery cannot "feasibly" be distributed to the "intended beneficiaries." Pearson v. NBTY, Inc., 772 F.3d 778, 784 (7th Cir. 2014).

Barnes argues the low response rate from the class shows that the notice plan was inadequate. The law generally does not view a low response rate from the class as necessarily an indicator of inadequate notice, as opposed only to a

factor that may be considered. Pollard v. Remington Arms Co., LLC, 896 F.3d 900, 906 (8th Cir. 2018) ("In the end, the low claim submission rate, while not ideal, is not necessarily indicative of a deficient notice plan."); In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 318 n.63 (3d Cir. 1998). Characterizing a claims rate as high or low depends on the context of the relief a proposed settlement affords. McAdams v. Robinson, 26 F.4th 149, 154 n.4 (4th Cir. 2022).

One court has cited evidence that "response rates in class actions generally range from 1 to 12 percent, with a median response rate of 5 to 8 percent." Gascho v. Glob. Fitness Holdings, LLC, 822 F.3d 269, 290 (6th Cir. 2016); accord Jones v. Monsanto Co., 38 F.4th 693, 698 (8th Cir. 2022), cert. denied, 143 S. Ct. 2458 (2023) (" 'a claim rate as low as 3 percent is hardly unusual in consumer class actions and does not suggest unfairness.' ") (quoting Keil v. Lopez, 862 F.3d 685, 697 (8th Cir. 2017)); Sullivan v. DB Invs., Inc., 667 F.3d 273, 329 n.60 (3d Cir. 2011) (" '[C]onsumer claim filing rates rarely exceed seven percent, even with the most extensive notice campaigns.' ") (quoting App'x 1550)). In Roes, 1-2, the court viewed a response rate of 18.5 percent as low, but that case was not a consumer class action or specifically a data breach claim, but an employee classification case in which class members "stood to receive hundreds of dollars if they made a claim." 944 F.3d at 1046 n.7. In Pearson, the court was critical of a class settlement in which the claims rate was 0.25 percent overall and, for those who received postcards, 0.64 percent, but the court's criticism came in the context of other significant concerns including excessive attorney fees, a reversionary fund, and an

agreement that attorney fees the court did not permit to be paid to class counsel also would revert to the defendants, leading the court to conclude the claims process had been structured to discourage claims. 772 F.3d at 780, 782-83.

In contrast, Pollard was a class action on behalf of the then "current" owners of "approximately 7.5 million" firearms produced since 1948. 896 F.3d at 903. Initially, notice consisted of circulation for 24 months between February 2015 and February 2017 of postcard notices, magazine notices, posters, website postings, internet banners, and Facebook advertising. Id. at 904. Concerned about the claim submission rate, the trial court ordered further notice consisting of a targeted social media campaign, national radio campaign, e-mail notification, and additional postcards and posters. Id. at 905. Ultimately, 22,000 claims were received representing approximately 0.29 percent of the 7.5 million firearms at issue. Id. The court placed the response rate in the context of the class settlement affording class members benefits worth approximately $70.00, $12.00, or $10.00. Id. at 904, 906. Given the exhaustive efforts at notice, notwithstanding the low response rate "the notice plan was adequate and satisfied the methods and mechanisms for disseminating notice set forth in" Rule 23. Id. at 906-07. These decisions show that a response rate is relevant only secondarily to the examination of the notice that was provided in the context of the possible forms of notice reasonably available.

The superior court focused on the adequacy of the notice plan, commenting at the final fairness hearing that "the thing that stands out to [the court] the most as being potentially deficient is the notice." In executing a notice plan using known

e-mail and postal addresses, the parties appropriately started with the U.S. Supreme Court's baseline rule requiring individual notice to class members who can be identified through reasonable effort. Eisen, 417 U.S. at 173. Expanding the notice plan, as well as evaluating the response rate, must take into account the fact the class is admittedly one that is difficult to reach, and the extent to which additional means of notice are available. Here, the notice approved by the superior court relied additionally on the Facebook and Instagram posts, the settlement website, and the toll-free telephone number. Beyond these, Barnes points to the possibility of posting notice in " 'homeless shelters, libraries, and transportation centers,' " on a " 'city's' " website, and direct distribution in person to the unhoused population. However, all of these forms of notice—those that were used and the ones Barnes urges—are subject to the limitations inherent in notice other than direct notice to the class member, as it is understood that "notice by publication or via the Internet tends to be ineffectual when the class consists of consumers." Pearson, 772 F.3d at 784.

The notice plan heeded the concerns of Roes, 1-2 to do "more" than rely on mail alone, by using known e-mail addresses, online advertising, and a toll-free phone number to call. The above decisions and our standard of review instruct that, provided a notice plan affords individual notice to members who can be identified through reasonable effort, it is within the superior court's discretion to assess the extent to which additional available means of notice must be employed to provide the best notice practicable under the circumstances. This includes, and may require, means of cumulative individual notice such as reminder notices and

21

use of e-mail in addition to first class mail, and means of non-individual notice such as advertising, general postings, or other community outreach. Together with the settlement anticipating and mitigating the difficulty of notice by providing for cy pres relief, the superior court had a tenable basis to rule that the level of notice given in this case was sufficient without additionally requiring further steps. The superior court therefore did not abuse its discretion.

C

Barnes argues the settlement is not fair, reasonable, or adequate because the settlement amount is inadequate, a circumstance Barnes ties to her argument that the settlement is the product of collusion between the settling parties. We disagree.

"In class action cases, the courts have 'an independent obligation to protect the interests of the class.' " Deien, 26 Wn. App. 2d at 65 (quoting In re Nat'l Football League Players Concussion Injury Litig., 821 F.3d 410, 430 (3d Cir. 2016)). "Although CR 23 is silent in guiding trial courts in their review of class settlements, it is universally stated that a proposed class settlement may be approved by the trial court if it is determined to be 'fair, adequate, and reasonable.' " Pickett, 145 Wn.2d at 188 (quoting Torrisi v. Tucson Elec. Power Co., 8 F.3d 1370, 1375 (9th Cir. 1993)).

The superior court's determination involves a balancing of several factors, including

> the likelihood of success by plaintiffs; the amount of discovery or evidence; the settlement terms and conditions; recommendation and experience of counsel; future expense and likely duration of litigation;

recommendation of neutral parties, if any; number of objectors and nature of objections; and the presence of good faith and the absence of collusion.

Pickett, 145 Wn.2d at 188-89. This list of factors is not exhaustive and every factor will not necessarily be relevant in every case. Id. However, the court's " 'role in evaluating a proposed settlement must be tailored to fulfill [these] objectives.' " Deien, 26 Wn. App. 2d at 67 (alteration in original) (quoting Officers for Justice v. Civil Serv. Comm'n of City & County of San Francisco, 688 F.2d 615, 625 (9th Cir. 1982)). Courts apply "heightened scrutiny" when "assessing class settlements negotiated prior to class certification." Roes, 1-2, 944 F.3d at 1048; accord Sullivan, 667 F.3d at 319; Mars Steel Corp. v. Cont'l Ill. Nat. Bank & Tr. Co. of Chicago, 834 F.2d 677, 681 (7th Cir. 1987); Weinberger v. Kendrick, 698 F.2d 61, 73 (2d Cir. 1982).

In reviewing a superior court's determination of whether a class settlement was fair, adequate, and reasonable, we apply an abuse of discretion standard. Pickett, 145 Wn.2d at 191-92. "Due to the consensual nature of settlements, the trial court's inquiry is 'delicate' and 'largely unintrusive.' " Deien, 26 Wn. App. 2d at 67 (quoting Pickett, 145 Wn.2d at 189, 35 P.3d 351). Our task is even more limited than that of the superior court. Id. In reviewing an order granting approval of a class settlement, we accord great weight to the superior court's views. Id.

Barnes argues that Hall and Summers's counsel engaged in a collusive effort with Sea Mar to thwart Barnes's effort to consolidate the actions, ultimately arriving at a settlement that was not in the class's interests. Barnes points to the removal as preventing the superior court from reaching her first motion to

23

consolidate. The timeline rebuts Barnes's theory of collusion. Sea Mar received Hall's first discovery requests in January 2022. Sea Mar notified HHS of the litigation and sought certification of immunity under the PHSA and FSHCAA. Barnes, 2022 WL 1541927 at *1. Then, a United States attorney filed a notice advising the superior court that the United States was considering whether it would intervene in the action. Id. These actions occurred six and three days, respectively, before Barnes filed her motion to consolidate. Sea Mar was already preparing to remove the six lawsuits to federal court before being served with the motion to consolidate. And even if Sea Mar had filed its notice of removal in bad faith, which the federal court never found, Sea Mar did not stipulate to remand Hall's and Summers's actions until after the magistrate judge's report and recommendation, id., and Barnes's action was remanded to state court allowing her to fully present her arguments in support of coordination in her second motion to consolidate filed on May 20, 2022.

Barnes further points to Hall and Summers opposing consolidation and settling unilaterally, arguing the absence of appointed lead counsel undermined the class's negotiating position. Lead counsel may be appointed by the trial court to engage in settlement negotiations, and that responsibility may call for appropriate communication with other counsel representing class members. Boesky, 948 F.2d at 1365. In cases in which lead counsel has been appointed, a court may consider lead counsel's communications with other counsel as a factor bearing on whether to approve a settlement. Id. At the same time, when reviewing requests for approval of attorney fees, courts may conclude that counsel for other

plaintiffs and class members may not merit compensation from a class settlement if their efforts did not " 'create, discover, increase, or preserve the class's ultimate recovery.' " In re Volkswagen "Clean Diesel" Mktg., Sales Pracs. & Prods. Liab. Litig., 914 F.3d 623, 644-45 (9th Cir. 2019) (internal quotation marks omitted) (quoting In re Cendant Corp. Sec. Litig., 404 F.3d 173, 197 (3d Cir. 2005)). It follows that counsel pursuing a putative class action may negotiate a proposed settlement with the defendant without involving counsel pursuing other actions against the defendant, subject to review under Pickett.

The court appropriately considers "the presence of good faith and the absence of collusion" in evaluating a class settlement. Pickett, 145 Wn.2d at 188-89. Barnes points to the danger of "a 'reverse auction'—where 'the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with in the hope that the district court will approve a weak settlement that will preclude other claims against the defendant.' " Swinton v. SquareTrade, Inc., 960 F.3d 1001, 1005 (8th Cir. 2020) (quoting Reynolds v. Beneficial Nat'l Bank, 288 F.3d 277, 282 (7th Cir. 2002)). A "reverse auction" may be signaled by the presence of suspiciously generous attorney fees, mendacity, or underhanded activity. See id. at 1005-06. It may also be signaled by such behaviors as " 'a Machiavellian plan to undercut the movants' negotiating position,' " such as in one case, "leaving the law firm that first filed the case and commencing a second, competing action." Id. at 1006 (quoting Tech. Training Assocs. v. Buccaneers Ltd. P'ship, 874 F.3d 692, 695, 697 (11th Cir. 2017)).

25

The facts of Swinton are if anything more concerning than those presented here, yet still the court did not find a collusive reverse auction. In Swinton, a later-filing class action plaintiff reached a settlement with the defendant. Id. The later-filing plaintiff copied another plaintiff's first-filed complaint, and the first filing plaintiff sought to intervene in the settling plaintiff's action. Id. The proposed intervenor defeated an arbitration defense in his first-filed action. Id. at 1003. The later-filing plaintiff never litigated the defendant's arbitration defense, and did not complete discovery, but instead negotiated a class settlement. Id. at 1006.

There is a rough similarity between the settling plaintiff in Swinton evidently not doing the work to defeat the arbitration defense and Hall and Summers here allegedly not aggressively fighting the removal to federal court and asserted immunity defense. But the superior court nevertheless found the settlement on balance to be fair, adequate, and reasonable. At the final fairness hearing, the settling parties denied that they settled due to a compromise for the alleged immunity defense, and the superior court was entitled to conclude that was accurate. While there was risk of a reverse auction to the extent there is in any case in which multiple proposed class actions are presented, Barnes's lead argument that Sea Mar's removal to federal court was designed to frustrate consolidation is not borne out by the record. It further ignores that after remand Barnes had a full hearing on her motion to consolidate. Barnes does not point to any other circumstances such as suspiciously generous attorney fees, mendacity, underhanded activity, "Machiavellian" plans, or any other machinations suggesting

26

anything other than evaluation of Hall and Summers's proposed settlement on its merits in relation to the class's claims.

Barnes seeks to show the settlement was a " 'weak' " settlement, and leverages her argument that it was borne of Hall and Summers's counsel's rush to settle before potentially losing control in the consolidated proceeding that Barnes advocated.  Barnes argues, "The only explanation for the inadequate Settlement amount is that Settling Counsel discounted for the risk of not being appointed interim lead counsel and for Sea Mar's immunity defense, which was easily defeated by Barnes and the other Non-settling Plaintiffs prior to preliminary approval."  But Barnes fails to support her argument that the settlement was "weak" without resort to speculation.

The parties agree the settlement here provides a fund up to approximately $3.66 per class member.  Barnes argues the relevant point of comparison is whether Social Security numbers were compromised and points to cases she says resulted in settlements of $17.82 per class member and $53.28 per class member in such cases, compared to settlements of $2.88 and $1.02 per class member for breaches affecting only payment card information and website login credentials.  Meanwhile, in addition to the fact that less than a fifth of the class here had Social Security numbers compromised, Hall and Summers point to settlements, they say involving compromise of Social Security numbers, amounting to $0.90, $0.76, $1.31, and $0.85 per class member.  However, the parties do not provide an adequate record supporting these data, and they do not attempt to explain why these cases and aggregate settlement figures are similar or dissimilar for

27

settlement purposes to the claims advanced by the class. This led the superior court to comment, "[I]t was somewhat disappointing to see that what should be a pretty cut and dry factual matter about what other cases settled for seems to be in dispute and there seems to be some claim that there has been less than transparency on this issue."

A proposed settlement is not judged against a hypothetical or speculative measure of what might have been achieved. Officers for Justice, 688 F.2d at 625. A possibility that the settlement could have been better does not mean it was not fair, reasonable, or adequate. Hanlon v. Chrysler Corp., 150 F.3d 1011, 1027 (9th Cir. 1998), overruling recognized on separate grounds by Castillo v. Bank of Am., NA, 980 F.3d 723, 729 (9th Cir. 2020). The nature and claims of a particular class harmed by a data breach may differ from those of another class. For instance, the class action may be as broad as one "affecting the personal information of almost 150 million Americans." In re Equifax Inc. Customer Data Sec. Breach Litig., 999 F.3d 1247, 1257 (11th Cir. 2021), cert. denied, 142 S. Ct. 431 (2021), and cert. denied, 142 S. Ct. 765 (2022). Or, a class may be narrowly comprised of banks that issued credit cards compromised in a data breach. In re Home Depot Inc., 931 F.3d 1065, 1072 (11th Cir. 2019). In the absence of a basis for comparing the settlement at issue to the settlement in any other case, supported if necessary by a documentary record, it is speculative to say the amount of the settlement is inadequate in comparison to other cases.

Finally, Barnes argues the scope of the release is not clearly limited to claims based on the data breach or alleged in the litigation, but improperly releases

other claims, such as claims arising out of class members' employment or medical care. A class settlement agreement may preclude a party from bringing a related claim in the future " 'even though the claim was not presented and might not have been presentable in the class action,' " but only where the released claim is " 'based on the identical factual predicate as that underlying the claims in the settled class action.' " Hesse v. Sprint Corp., 598 F.3d 581, 590 (9th Cir. 2010) (quoting Williams v. Boeing Co., 517 F.3d 1120, 1133 (9th Cir. 2008); Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1287 (9th Cir. 1992)). The settlement agreement provides "a general release of Sea Mar for all claims and causes of action pleaded or that could have been pleaded that are related in any way to the activities stemming from the Sea Mar Data Incident described in the operative Complaint." The scope of the release is cabined by the data security incident as described in the Summers complaint. The release is not improperly overbroad.

Affirmed.

Birk, J.

WE CONCUR:

Feldman, J.                    Coburn, J.